Anchor Realty and Investment Company, v. William E. Rafferty et al.
Olive A. Drumm, Appellant, v. Anchor Realty and Investment Company, Appellee.

**Gen. No. 41,449.**

486

Opinion filed February 26, 1941. Rehearing denied March 10, 1941.

CHARLES F. McELROY, of Chicago, for appellant; MAURICE M. BRIGGS, of Chicago, of counsel.

HUGHES & SWANSTROM, of Chicago, for appellee; FRANK H. KLAAS, of Chicago, of counsel.

MR. PRESIDING JUSTICE HEBEL delivered the opinion of the court.

The Anchor Realty and Investment Company, of St. Louis, a Missouri corporation, brought suit to foreclose a mortgage on certain real estate in Chicago, title to which was in defendants William E. and Gertrude C. Rafferty. Later Olive A. Drumm was joined as additional defendant. Mrs. Drumm filed an answer and counterclaim against the plaintiff, claiming that she is the rightful owner of the Rafferty mortgage, and of 220 shares of stock of plaintiff corporation, which were purchased by the plaintiff at a public sale from the Mississippi Valley Trust Company on September 11, 1933. Mrs. Drumm had previously borrowed certain money from the Trust Company and had given a note, with said stock and the Rafferty note and mortgage as collateral. After several renewals of the note the Trust Company refused to renew again. As she was unable to pay, the bank sold her collateral, and the plaintiff purchased it. Mrs. Drumm claimed that the purchase was tainted with fraud, and asked to have a constructive trust decreed in her favor, both of the stock and of the Rafferty note and mortgage.

The case was heard by the trial court without a jury; the counterclaim was dismissed for want of equity, from which order the counterclaimant prosecutes this appeal.

From the facts as they appear, William L. Balson, father of Mrs. Drumm, counterclaimant herein, died testate in 1914; by his will, he created a trust of all his property, which trust included a spendthrift clause. Upon the death of his widow, it became necessary to distribute the property. E. J. Bean, a St. Louis attorney, devised a plan to form a corporation to handle the property and liquidate it. It also appears from the evidence that for several years prior to the death of the widow, E. J. Bean had been employed as the attorney for the beneficiaries of said trust, except Lewis Balson (son) and the widow, to bring an accounting against the trustees who were Lewis Balson, Ella Balson, the widow, and Mississippi Valley Trust Company. Settlement negotiations were pending at the death of the widow, Ella Balson; thereafter on or about July 17, 1929, an agreement was entered into by the beneficiaries, reciting that by Ella Balson's death, the ''trust was and is terminated and it is desired by the surviving Trustees . . . to make distribution and settlement of the balance of the property and assets in their hands . . . .'' Pursuant to said agreement, the surviving trustees distributed said trust estate to the beneficiaries by deed, and the beneficiaries then conveyed their respective interests to Anchor Realty & Investment Company, a Missouri corporation, in accordance with said settlement agreement because it was impractical that seven children and two grandchildren hold title to the real estate. The corporation was formed, having a capital stock of 3,920 shares, of which Lewis Balson was to receive 320 shares, the five daughters 600 shares each, and two granddaughters 300 shares each. Mr. Bean had not received any compensation for his services in connection with the settlement with the trustees and for other services in connection with the formation of the corporation and because there was little personal property distributed to the beneficiaries, it was agreed that

certain of the children give Bean certain shares of stock for his past services. Accordingly all of the children, except Lewis Balson, each transferred 50 shares of stock and the two grandchildren transferred 15 shares each, making a total of 280 shares which were transferred to Bean, which he accepted in payment of his fee. Naturally, Bean received dividends along with the other stockholders. He was elected president, treasurer and director of said corporation and has held those offices since then, for which services he charged no salary.

In August, 1931, the United States gave notice of a levy of a tax in the amount of $15,723 as taxable income against said Anchor Corporation arising from alleged profits or gain on the sale of certain property to Joseph Garavelli for $170,000. Bean was authorized by the board of directors to oppose said tax. Bean appeared as attorney for said Anchor Corporation before the collector of internal revenue in opposition to said tax and caused the same to be reduced to $11,488, which was paid under protest. Thereafter, on September 13, 1932, Bean filed suit in the United States District Court at St. Louis, Missouri, and upon trial the court entered a judgment in favor of said Anchor Company, which was appealed to the United States Circuit Court of Appeals, where the judgment of the district court was affirmed. Bean tried the case in both courts, made arguments, and collected the judgment in the amount of $13,150, from which he was paid a fee of $3,750 for his services, which was authorized by the other two directors.

In May, 1931, E. J. Bean negotiated for Mrs. Drumm a $5,500 loan from the Mississippi Valley Trust Company in St. Louis, evidenced by her promissory note and secured by her 220 shares of Anchor stock and the Rafferty note and trust deed foreclosed upon in this action. Bean received $250 for his services. Subsequently, on demand from the bank, Mrs. Drumm exe-

cuted an assignment of the dividends from said pledged stock as additional collateral. There were subsequent renewals and Bean handled the renewals to accomodate Mrs. Drumm, but he was not retained.

In December, 1932, Mrs. Drumm came to St. Louis with a Mr. Goldsmith who asked Bean to cash a check signed by Mrs. Drumm for $125. Bean went with Goldsmith to the bank where Bean indorsed the check. The check was not honored by the bank on which it was drawn because of no funds. Thereafter, Mrs. Drumm gave Bean another check dated December 19, 1932, on the same bank for the amount of the original check, plus protest fees, which was also dishonored and was protested. Bean then drew a draft on Mrs. Drumm which was not paid. After this time, it is admitted that Bean had no further negotiations or contacts with Mrs. Drumm, nor did Mrs. Drumm request Bean to attend to further renewals.

It further appears that Bean, as the representative and on behalf of the Anchor Realty and Investment Company, arranged with the Mississippi Valley Trust Company to procure a loan for the purpose of purchasing this collateral, giving the note of the Anchor Company and depositing the identical collateral to secure it. The price bid at the sale was $145.82 in excess of the amount due on the note, plus interest and costs, and that much in excess of the next highest bid. Bean, thereupon, garnished the bank and thus procured payment to himself of the amount due on the protested check of Mrs. Drumm.

It also appears from the evidence that on January 23, 1933, a new note was given to the bank, which was a renewal of her former note, which became due April 23, 1933. Bean had nothing to do with this note. When this note matured the bank corresponded with Mrs. Drumm, and after several months of useless negotiations proceeded to sell the collateral. The bank advertised the sale to be held on September 11, 1933, and

sent a copy of the advertisement to Mrs. Drumm on August 29, 1933, which letter was not returned to the bank. The bank also notified Bean who cut out the advertisement from the paper and showed it to Lewis Balson, at whose suggestion Bean put the notice in an envelope and mailed it to Mrs. Drumm. Mrs. Drumm had knowledge of the sale before September 11, 1933. A meeting of the board of directors of the Anchor Company was held September 7, 1933. The directors at that time were Lewis Balson and E. J. Bean. Mrs. Hayes had been a director but had returned to California and had submitted her resignation. There is a conflict of testimony as to whether written notice of this meeting was sent to Lewis Balson. Both Bean and Balson were desirous of preventing an outsider from becoming a stockholder. The directors passed a resolution authorizing Bean to bid the sum of $5,500 on behalf of the corporation. At the sale the Anchor Company bid the sum of $5,310, being $145.82 more than the amount due on the amount bid at the sale and took the collateral. A loan was negotiated by the Anchor Company at the bank of a sufficient amount to pay the bid, which loan was secured by the purchased collateral. This loan has since been paid by the Anchor Company, together with $801.67 interest.

As we have already indicated, after this sale, Bean brought an attachment suit and garnisheed the bank for the surplus, which it held for Mrs. Drumm. In this manner, Bean collected the debt due him on account of the dishonored check of Mrs. Drumm.

The account of cross complainant, Mrs. Drumm, is as follows:

May 28, 1931————Mrs. Drumm obtained loan from Mississippi Valley Trust Co. of . . . $5,500.00
Secured by the following collateral:
(1) 220 Shares Anchor Realty

           (2)   Principal note of the Raffertys' in the sum of $5,500.00

February 1, 1930—Rafferty paid $3,000.00, reducing his $5,500 note to $2,500, which, as reduced, was extended for 2 years (or until 2-1-34), which is the note being foreclosed.

At this time another note of the Raffertys' for $3,000 (secured by trust deed on other Chicago Property) was deposited with the Mississippi Valley Trust Company as collateral for Mrs. Drumm's note.

September 7, 1933—Meeting of directors of Anchor Realty Co.—resolution authorizing Bean to bid "not in excess" of $5500.00 for Drumm collateral.

September 11, 1933—Sale held—Bean bid in for $5310.00, thereby buying the following collateral:

           (1)   220 shares of Anchor Realty

           (2)   $2,500 balance on Rafferty note (herein being foreclosed).

           (3)   $3,000.00 Rafferty note (secured by trust deed on other Chicago property).

In order to procure the money to make the purchase, the Anchor Realty & Investment Co. borrowed $5310.00 from the Mississippi Valley Trust Company and gave its note therefor,

secured by the identical collateral of Olive A. Drumm which it had just purchased.

The proceeds of the sale were applied by the Mississippi Valley Trust Co. as follows:

| | |
|---|---|
| Amount received at sale | $5310.00 |
| Applied on principal | $5,057.07 |
| Advertising cost | 61.22 |
| Federal Transfer tax | 8.80 |
| Interest | 37.09 |

Balance remaining on hand...............$145.82

November 20, 1937—Anchor Realty Co. paid $1,120.00 on its note of $5310.00, leaving balance of $4190.00.

December 27, 1937—Rafferty paid $3100.00 (in full of principal and interest of his $3000 note), which payment was credited on Anchor Realty $5310.00 note, leaving balance of $1,090.00 on said Anchor Realty note.

July 13, 1938———Anchor Realty paid $200 on its $5310.00 note.

August 15, 1938———Anchor Realty paid balance of its $5310.00 note. At this time the Mississippi Valley Trust Company turned over to the Anchor Realty Company, the following collateral:

(1) 220 shares of Anchor Realty.

(2) $2,500 (balance) Rafferty note, which is being herein foreclosed.

April 1, 1934———Dividend of 20¢ per share paid; 220 shares at 20¢... $  44.00

Sept. 4, 1934————Dividend of $6.00 per share paid; 220 shares at $6.00.. 1320.00

Sept. 16, 1936————Dividend of 50¢ per share paid; 220 shares at 50¢.... 110.00

Total.... $1474.00

April 1, 1940————Dividend paid April 1, 1940, on said 220 shares ........ 880.00

. . .

COMPUTATION

Advanced by Anchor Realty & Investment Co. for purchase of Drumm collateral...... $5,310.00

Interest paid by Anchor Realty & Inv. Co.. 879.21

Total paid by Anchor............ $6,189.21

. . .

Credits;

December 7, 1937, By cash from Rafferty in full of principal on his $3,000.00 note.....$3,000

Dividends allowed:

April 1, 1934............................$ 44.00

Sept. 4, 1934............................ 1320.00

Sept. 16, 1936............................ 110.00

1,474

Dividend paid April 1, 1940          880    5,354.00

Amount that Anchor Realty actually paid out in excess of credits          ·    $ 835.21

The counterclaimant, appellant in this case, has suggested that her account with the Anchor Realty & Investment Company had not been credited with a number of payments that had been made on account of the note that was signed by her. However, it is

to be noticed from an examination of the figures that are in this record that all the amounts that were received in payment of the note were received subsequent to the sale, at which the Anchor Realty & Investment Company purchased and received the collateral.

The counterclaimant contends that the evidence shows a violation by E. J. Bean of his fiduciary relationship to her, by which he made use of knowledge gained by him as her attorney, to his own financial advantage and to her detriment; and that the purported resolution under which he acted in purchasing her collateral for the Anchor Realty & Investment Company was void because (a) the meeting was not called nor held according to law, and (b) Bean was disqualified to vote on the resolution by reason of the fact that one of its purposes was to further his own financial interests.

In discussion of the questions that have been called to our attention, it appears that the counterclaimant contends that there was a fiduciary relationship between herself and the counterdefendant existing at the time of the collateral sale because she claims that there was such a relationship existing between herself and E. J. Bean; and that since Bean was an officer and director of the Anchor Company, that said Anchor Company therefore had notice of the relationship. The facts as appear in this record are that E. J. Bean procured a loan for Mrs. Drumm in May, 1931, from the Mississippi Valley Trust Company, for which he received a fee of $250 for his services. It appears from the argument that we have before us that Bean obtained the loan, his fee was paid and that ended the relationship of attorney and client. Mrs. Drumm renewed her note several times and Bean saw the bank on occasions in that connection, but merely as a favor and accomodation. However, after the incident of the bad check that was issued by Mrs. Drumm in Decem-

ber, 1932, it is admitted that there was no communication of any kind between Mrs. Drumm and Bean. Mrs. Drumm did not look to Bean for any advice or assistance in connection with the renewal note dated January 23, 1933, or in connection with her difficulties when that note matured on April 23, 1933. She had all of her dealings direct with the bank. The sale did not take place until September, 1933, and she was, therefore, dealing directly with the bank for at least 9 months—as contended by counterdefendant; she did not write Bean or tell the bank that Bean would represent her. In spite of this she contends that there was a fiduciary relationship existing. The burden of proof in this respect is on her. (*Continental Ill. Nat. Bank & Trust Co. v. Continental Ill. Nat. Bank*, 87 F. (2d) 934.)

The counterclaimant further contends that she was entitled to notice of the termination of the relationship of attorney and client and in support of this contention cites authorities on the question of withdrawing from a pending case. The counterdefendant admits that these authorities state the rule of law, but states that in this case there was nothing to withdraw from. Bean was employed to get the loan and when he did so, his work was done—the matter of his employment had ended. "The relationship of attorney and client is terminated by the accomplishment of the purpose for which it was created . . . ." Thornton on Attorneys at Law, vol. 1, p. 248. Mrs. Drumm had a man named Goldsmith who handled her affairs, who wrote letters for her in connection with her affairs, and who picked up her bank statements. He would turn the bank statements over to her if he were so inclined. That is how she explains not getting any notice about the bad check or the draft that Bean drew on her. If her agent—as is suggested—had notice, then she, too, must be held to have had notice. It is

contended, therefore, by the counterdefendant, that the relationship of attorney and client terminated when the loan was procured.

It does not appear from anything in the evidence that Bean used any knowledge or influence that he had acquired while acting as her attorney. He did not acquire anything except the payment of his debt from Mrs. Drumm when he instituted the garnishment proceeding to collect the amount of money that was due him upon the dishonored check.

When we come to consider the law that is pertinent on a question of the character that we have before us, the court in *Harrison v. Murphey,* 39 Okla. 548, in denying recovery to the plaintiffs, said: "There was no fraud; no false statements; no overreaching of plaintiffs; . . . It cannot be that an attorney, in the absence of fraud or an abuse of confidence in some way is forever barred from acquiring property, honestly and in good faith, solely because it had formerly belonged to a person who at some time in the past had been his client." This language, of course, could apply with equal force to the present case. It does not appear from anything which we have in this record that Bean was a party to this litigation or that in his actions in appearing at the sale of the property in question he acted other than in behalf of the Anchor Realty & Investment Company; and, of course, there was no obstacle to Mrs. Drumm to meet this obligation when it matured. There would have been no trouble if she had paid her loan to the Mississippi Valley Trust Company. It appears from the record that Mrs. Drumm had notice of the sale; that both Bean and Mr. Walter of the bank sent her notice. Mrs. Drumm testified that "Mr. Goldsmith very likely got it" and "I didn't know . . . that the bank was going to proceed with the collection of the note. I knew one or two days before the sale . . . ." It does not appear that it was through the fault of the bank or the Anchor Company or any of

its officers or directors that she did not attend the sale or have someone represent her. She did not request Bean to represent her and had no contact with him for more than 9 months prior thereto. It is impossible to reach the conclusion—as contended by the counterclaimant—that Bean should have represented her. There was nothing required of Bean to finance Mrs. Drumm in purchasing the collateral, nor was there a duty on the Anchor Company to extend credit on behalf of one of its stockholders who was in financial difficulties with the bank.

Counterclaimant contends that there was a fiduciary relationship existing because Bean had represented her and other beneficiaries in securing an accounting in the Balson Trust. It appears from the evidence that after a settlement was made, the assets of the trust were distributed and the trust terminated according to its terms. The beneficiaries, including Mrs. Drumm, transferred stock to Bean for his fee and Bean, therefore, had to wait until dividends were declared from income or sale of assets until he could realize anything. It further appears that he was elected a director and officer and the by-laws provided that the officers would be paid no salaries without the approval of the board of directors. The payment that Mr. Bean received was the stock that was issued to him at the time of the organization of the Anchor Company as a corporation. But the counterclaimant contends that these facts show Bean is still representing her in connection with the trust. As we have already indicated—and as suggested by counterdefendant— Bean was paid when he got the stock—that was his fee. The fact that he might have to wait until he could liquidate it, has no bearing.

The counterclaimant argues that because she gave Bean a bad check that Bean became antagonistic with her and devised a method not only to satisfy this indebtedness but also to deprive her of her entire hold-

ings in the Anchor Company as well as the pledged mortgage. The only evidence that appears in this record is that the directors of the Anchor Company, Bean and Balson, "thought it would be to the advantage of the Company to purchase the stock . . . ." Lewis Balson testified as witness for the counterclaimant, his sister, "I was without funds to help her, and fearing that some outsider would step in and buy the stock. I thought the best way would be to have the corporation buy it . . . ."

The counterclaimant in her brief sets forth figures to show that the Anchor Company received property more than twice the value of her total indebtedness. The Anchor Company paid more than $6,000 for principal and interest. The Rafferty mortgage is figured at the bid price plus the deficiency, but there is no evidence of the value of either the property or the deficiency—nor is there any evidence that the fee paid to Bean in the income tax suit was illegal as stated, and the question cannot be litigated in this suit because Bean is not a party to the action.

It is contended that Mr. Bean and Mr. Balson, as officers and directors occupied a fiduciary relation to counterclaimant, and a case is cited by counterclaimant stating the rule that directors of a corporation occupy the position of trustees for the collective body of stockholders. That is the rule that applies where all or a majority of the stockholders are so involved as to justify applying such a rule. However, ". . . a director is not a trustee in a technical or unlimited or universal sense. Moreover, he is not a trustee as to individual shareholders, so as to preclude him according to the weight of authority from dealing with individual shareholders in respect to the sale or purchase of their shares." 19 C. J. S., sec. 761. A director or officer of a corporation may be a trustee for stockholders for certain purposes, but certainly not for all purposes and not to the extent of protecting stock-

holders in their dealing with third persons and where a stockholder pledges some of the corporate stock to secure the stockholders' personal indebtedness. ''The relation of shareholders to a corporation is contractual . . . . There is no fiduciary relation between shareholder and corporation such as is found in all express trusts.'' Bogart on Trusts and Trustees, vol. 1, 55 sec. 16. It must be admitted, of course, that for certain purposes a corporation, its officers and directors are trustees for the stockholders, but not for all purposes. ''The officers of a corporation are trustees for the stockholders as a body with respect to the business and property of the corporation, which is under their control and management for the benefit of stockholders generally, but an officer has no control over the shares of the individual stockholder and is not a trustee for such stockholder with respect to his stock. Officers of a corporation may purchase the stock of stockholders on the same terms and as freely as they might purchase of a stranger.'' *Bawden v. Taylor,* 254 Ill. 464, 467. ''The rule as to a director is stated in Cook on Stock and Stockholders, (sec. 320) as follows: 'There is no confidential relation between him and a stockholder, so far as a sale of the stock between them is concerned, and so long as he remains silent and does not actively mislead the person with whom he deals the transaction cannot be set aside for fraud.' '' *Hooker v. Midland Steel Co.,* 215 Ill. 444.

It does not appear from the record that Mrs. Drumm was defrauded. No representations were made to her as to the value of her shares by the officers and directors of the Anchor Company, nor did they withhold any information from her. The Mississippi Valley and Trust Company sold the collateral at a public sale where anyone could bid. Mrs. Drumm could have bid at the sale but she did not elect to do so. The directors of the Anchor Company were of the opinion that it would be beneficial to the cor-

poration to have these shares rather than have some outsider bid them in, and authorized a bid up to $5,500. This did not in any way prevent anyone, including Mrs. Drumm, from bidding at the sale. As we have stated, Mrs. Drumm did not attend the sale or have anyone to represent her there.

It is also contended by the counterclaimant that because Mr. Bean was her creditor and procured the satisfaction of the debt by having the corporation bid more than the amount due the bank, was such an act that the corporation should not be permitted to retain the stock. As suggested by counterdefendant—if there was anything wrong in including this amount in the bid, it is for the present stockholders to complain and not Mrs. Drumm, the debtor.

A further suggestion that is offered by counterclaimant is that the meeting of the board of directors held on September 7, 1933, was invalid, her theory being that because the Anchor Company acquired the legal title by its purchase at the collateral sale a constructive trust arises. Counterdefendant contends that this argument is inconsistent, and that the sale cannot be good and bad at the same time, and suggests that counterclaimant is not trying to set aside the sale.

It is further urged that the Anchor Realty and Investment Company had the power to purchase the collateral without the necessity of the resolution of the board of directors; that it had power in its charter to purchase its own shares and the mortgage, and, therefore, did not need a resolution of its board of directors to give it any power; and that the Mississippi Valley Trust Company wanted a resolution to show authority to make the loan and not authority to purchase. The only personal interest that any of the directors had was Bean's claim against Mrs. Drumm and because the corporation bid enough to leave a small surplus subject to garnishment she wants to have

the meeting declared illegal. There is no evidence that she ever made an attempt to do so before, nor that any of the other stockholders attempted to have the transaction set aside. Mr. Bean took up the matter of the purchase with the majority of the stockholders and sent them a notice of the sale. Any complaint should come from the present stockholders and not Mrs. Drumm, and any action would be at law against Bean and not against the corporation.

There is a further complaint by counterclaimant that the circumstances that the bank was not willing to renew Mrs. Drumm's note, although it was willing to loan the Anchor Company over $200 more with the same collateral, indicates collusion. So far as we have found from the record, there is not a scintilla of evidence to substantiate such an inference. On the contrary, the bank was having difficulties with Mrs. Drumm long before the sale. The two officers of the bank who handled the matter testified that Mr. Bean never requested that the bank sell the collateral. The loan was an impersonal transaction with the bank and it took steps to collect. The bank was familiar with the assets of the Anchor Company and apparently considered the company a good credit risk. Mr. Bean made inquiry from the bank if it would make a loan in the event the corporation decided to bid and Bean was later notified that a loan could be arranged. The Anchor Company purchased the collateral at a public sale. It paid for the same with its check, and gave its note in the regular course of business to the bank to obtain the money. That note has since been paid, including interest thereon.

Counsel for counterclaimant directs our attention to the provisions of the will of William L. Balson, who died on the 3rd day of December, 1914, and contends that this court should declare a trust to be in existence, which trust—as suggested—had terminated by its own terms; and further contends that this

court is also to declare that a spendthrift trust exists under the will of the late William L. Balson. The will provided that the trust was to terminate and the estate be distributed upon the death of Ella Balson, widow, who died subsequent to the death of her husband. The provisions of this will that provide for a trust are found in the fifth paragraph, which provides in effect for a trust and that if testator's wife should survive him, the trust should continue for and during her natural life. Using the language of the last will and testament, "In the event of the death of my wife before my decease, or in the event of the death of my wife after my decease and before five (5) years from the date of my death, then and in that event said trust shall continue to the end of the period of five (5) years from the date of my death. After the death of my wife the trustees shall apportion the net income of the trust estate and pay one share to each of my surviving children and one share per stirpes to any descendants of any of my deceased children. On the termination of said trust as aforesaid the trustees shall divide the then trust estate into as many shares as necessary and convey, transfer, deliver and pay one share of the principal of the then trust estate to each of my then surviving children and one share per stirpes to any descendants of each of my children then deceased."

It appears from the record in this case that the widow passed away on February 6, 1929, and that the estate was distributed to the children and grandchildren—as we have indicated in the statement of facts—and subsequently they conveyed their interest to a corporation that was organized and formed for the purpose of liquidating the assets of the estate. Therefore, from the provisions of the will, it would seem that the trust had ceased upon the death of the widow; and, therefore, the distribution that was had justified the division of the trust property between

the children and grandchildren. Under the circumstances as we find the facts in this case, the trust was at an end at the death of the widow, and did not carry with it the spendthrift trust provisions of the last will and testament of William L. Balson. We are, therefore, of the opinion that there was no continuation of the trust after the distribution was made by the trustees to the beneficiaries, and that the shares of the counterclaimant were not impressed with a spendthrift trust as contended by her.

After having considered the questions that were called to our attention, we are of the opinion that the court in passing upon the counterclaim of Olive A. Drumm was justified in dismissing this counterclaim for want of equity.

For the reasons stated the court's order should be affirmed.

*Affirmed.*

DENIS E. SULLIVAN and BURKE, JJ., concur.