ROBERT J. VOSS *et al.*, Plaintiffs-Appellants, Cross-Appellees, *v.* LAKEFRONT REALTY CORPORATION *et al.*, Defendants-Appellees, Cross-Appellants.

First District (1st Division)   No. 62714

Opinion filed March 28, 1977.—Rehearing denied April 27, 1977.

Henehan, Donovan & Isaacson, Ltd., of Chicago (Edward V. Donovan, Jr., of counsel), for appellants.

John A. McElligott, of Chicago, for appellee Lakefront Realty Corporation.

Sidney Z. Karasik, of Chicago, for appellee Joseph M. Scanlan, Karl Scheribel, Irma Elmore, and Arthur Blome.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Robert J. Voss, Robert L. Bastian and Nelson Thomasson III (plaintiffs), brought this class suit on behalf of all similarly situated shareholders of Lakefront Realty Corporation (Lakefront). In addition to Lakefront, the defendants are four of its directors, Joseph M. Scanlan, Karl Scheribel, Irma Elmore and Arthur Blome (defendants). The general theory of plaintiffs is that defendants acted in contravention of their responsibility and their legal duty to Lakefront with regard to trading in corporate stock of Lakefront. Plaintiffs sought injunctive relief, an accounting and an order compelling defendants to transfer certain shares of their stock to Lakefront. There was a lengthy and complicated trial. The report of proceedings contains some 1000 pages. At the close of plaintiffs' case, on motion of defendants, the trial court entered a detailed

judgment order in favor of defendants. The trial court also denied defendants' motion seeking to recover costs and attorneys' fees from plaintiffs pursuant to section 41 of the Civil Practice Act. (Ill. Rev. Stat. 1975, ch. 110, par. 41.) Plaintiffs appeal and defendants cross-appeal. A factual summary is required.

Lakefront was created as a result of a 1947 reorganization of the bankrupt Lake Shore Athletic Club. The second product of that reorganization was the Lake Shore Club of Chicago (Club), a not-for-profit social and athletic club. Lakefront owns the land and building at 850 North Lake Shore Drive, in Chicago, and the personal property therein. Both Lakefront and the Club maintain offices in the building. This property is free from lien or encumbrance. All of this property is leased to the Club. The lease, expiring June 30, 1977, provides for a fixed minimum rent and for payment of all net profits of the Club as additional rent to Lakefront as lessor. The lease grants the Club a continuing option to purchase Lakefront's assets at a price of $6,600,000. In 1967 or 1968, a number of members of the Club unsuccessfully attempted to exercise this option. They were unable to obtain the required funds by solicitation of the Club's membership.

When Lakefront was incorporated, 100,000 shares of corporate stock were issued. A subsequent stock split has resulted in a total of 200,000 outstanding shares, of which 3380 shares are treasury stock. Ownership of Lakefront stock is restricted to dues-paying members of the Club. Article XII of the Lakefront bylaws states, as one of its purposes, facilitation of "the ownership of the stock of the corporation by as many such members [of the Club] as possible."

There are two methods by which Lakefront stock is traded. Members regularly buy and sell stock using Lakefront as a conduit in the transaction. Sales of stock in this manner are generally initiated when an offer to buy or sell stock is posted on the "bid and ask" board, sometimes referred to as the "quote" board, in the office of the secretary of the corporation. Responsive offers are then received by the corporate secretary. If there are no responses to such posted bids after four or five days, the secretary will contact those members who have expressed an interest in buying stock. She does not keep a formal list of such individuals and there is no particular order in which members are informed of stock availability.

To be considered "firm," an offer to buy stock in this manner must be accompanied by a check for the entire purchase price, payable to Lakefront. The money is then deposited in an "exchange shares" bank account. The seller receives a check for the purchase price, drawn on this account. The corporate secretary then directs the transfer agent to transfer the shares to the new owner. When this type of sale is

consummated, as a general matter, neither the buyer nor the seller is aware of the identity of the other.

Club members also buy and sell stock directly from each other, without recourse to the above method. There was testimony at trial that there has always been more Lakefront stock available for sale than there have been buyers. Membership in the Club has decreased by about 370 members since 1966. At present about 330 or 340 of the Club members own Lakefront stock.

In accordance with the applicable corporate bylaw, when an individual ceases to be a dues-paying member of the Club, he is notified that he must sell his stock to a Club member or to the corporation. Similarly, individuals who inherit Lakefront stock are notified that they must sell their stock. The form letter used in such instances informs the recipient of the current trading price of Lakefront stock and tells him that it is necessary to send his stock certificate to the corporation, duly endorsed with signature guaranteed by a bank or brokerage house. An exception to this general rule, established as a long-standing custom, is the situation in which a widow or other close relative of a deceased member of the Club inherits Lakefront stock. Such individual may elect to join the Club and retain the stock thus inherited. The widow of a Club member is generally permitted to use Club facilities without charge for several months after her husband's death and she has the option of becoming a member at a reduced fee.

All Lakefront shareholders may examine a list of the stock holdings of the various Club members at the annual shareholders' meeting. In addition, such a list is kept available in the secretary's office.

Prior to 1957, the book value was used as a trading price for Lakefront stock. In 1957, an amendment to the corporate bylaws was adopted containing a complicated formula for determining the trading price of Lakefront stock. At that time the trading price was computed by certified accountants in accordance with this formula as $6.06. Members were informed of this price by an official corporate letter which also told them that it was merely a general guideline for sales. As we will later note, recent attempts to recalculate the price according to this formula have resulted in a figure which is substantially lower than the actual price at which the stock is traded. Therefore, the computed trading price has not been used as a guide in stock transactions for some time. Lakefront stock currently sells for an average price in the vicinity of $9 or $10 per share.

The individual plaintiffs in this action are all members of the Club and are Lakefront shareholders. Robert Bastian owns 20 shares, Nelson Thomasson owns 210 shares and Robert J. Voss owns 700 shares.

This general background information will assist in our consideration of

the pleadings. On June 7, 1974, plaintiffs filed their third amended complaint alleging in substance that defendants, by means of their domination of Lakefront and pursuant to a conspiracy, have at various times purchased Lakefront stock for prices of $10 or less per share, at amounts substantially below the real value of the stock, to the detriment of Lakefront, in contravention of their responsibility to Lakefront and "in violation of the fiduciary duty imposed upon them by the mandate to purchase such stock for the corporation or to offer such stock for purchase to the membership generally of the * * * " Club. It alleged that such conduct was "in antithesis of the avowed purpose of the corporation to have disseminated widely the ownership of its stock among members of the Lake Shore Club * * *." The third amended complaint further alleged that the defendants conspired to keep available stock from being purchased by Lakefront or from being offered to the members but instead purchased over 40,000 shares of such stock for less than its real value.

In their answer, defendants denied all the allegations of misconduct. In a supplement to their answer, they alleged that plaintiffs' claims were barred by laches because the matters alleged in the complaint were known to plaintiffs for many years prior to the filing of the instant action.

We will next summarize the testimony under various topical subdivisions.

### Availability of Lakefront Stock

A large portion of the testimony presented in this case concerned the quote board where information was posted regarding the availability of Lakefront stock for purchase by members of the Club. That information was not posted elsewhere in the Club and was not included in the Club magazine or other correspondence sent to members. The one exception to this was correspondence sent out by Marshall Keig, during his tenure as first president of the Club and of Lakefront, urging members, in a most general manner, to purchase stock in the corporation.

At dinners given for new members of the Club, those present were informed about the availability of Lakefront stock to Club members. This discussion did not include information about specific offerings of stock. There was some testimony to the effect that this information is no longer presented at the dinners. However, one witness noted that the nature of the program at these dinner discussions depends upon the individual who is president of the Club at the time. There was testimony that this information was presented at the most recent new member dinners.

Plaintiff Robert Bastian testified that the quote board appeared to have fallen into disuse since about October 1966, though there were always

some shares listed on it for sale. Furthermore, during the past few years, he noted stock always was available to those members who wished to purchase it.

Nelson Thomasson, another plaintiff, who was secretary of the Club from 1967 until 1971, testified that the board was not used much after 1966 or 1967. He stated that in late 1970 or early 1971, he was told to refer inquiries about stock purchases to Mr. Scanlan, president of Lakefront. The witness knew of no individual who actually put in a bid for stock and was unsuccessful in purchasing the desired shares. Mr. Thomasson went on to state that he had discussed the unavailability of stock with other members of the Club in 1966 or 1967. He felt that it was inappropriate for him to file suit at that time as he was serving as secretary of the Club.

James Alletto, an employee of the Club for about 20 years, testified that he had noted no entries on the quote board between 1966 and 1970. Another witness who was a member of the Club, a Lakefront shareholder and a resident of the Club, stated that the board was not used since 1966 or 1967. Defendant Arthur Blome agreed that the board was usually empty. Plaintiff Robert Voss testified that he had noted only one listing of stock for sale on the board since 1966 or 1967.

In contradiction, defendant Joseph Scanlan, president of Lakefront, testified that the quote board is still in use though few people frequent the office in which it is located. He stated that there are currently 2200 shares of stock listed for sale on the board at prices ranging from $10 to $20 per share. One block of 1500 or 1700 shares has been listed on the quote board for over three years because the seller is asking too high a price. Lakefront stock generally sells for $9 to $10 a share. There are few buyers for stock which is priced higher. This was corroborated by Leota LaGrange, secretary to the general manager of the Club and assistant secretary of Lakefront. She has worked for the Club since 1965 and for Lakefront since late 1966 or early 1967. She is responsible for maintaining the quote board and for handling stock transactions. She stated that the quote board has always been maintained during her tenure with Lakefront. She noted that if stock remains listed on the board for four or five days, Mr. Scanlan instructs her to contact members of the Club who have expressed an interest in purchasing stock.

## Stock Holdings of Defendants

Defendant Joseph Scanlan testified that he owns 42,960 shares of Lakefront stock. He has purchased 1830 of these shares directly from private individuals. The remainder were purchased through Lakefront. On one occasion, Mr. Scanlan purchased stock from an individual who was unable to locate a purchaser for the stock at his asking price through the Club. Leota LaGrange, assistant secretary of Lakefront, testified that

Mr. Scanlan never entered a bid to purchase stock from the quote board until after she had contacted other interested members. She recalled only a single occasion on which he purchased stock which had not been listed first on the board. Scanlan further testified that he purchased some of his stock for $1 over the then current market price.

Karl Scheribel, defendant, a director of Lakefront since 1969, owns 3050 shares of Lakefront stock. He owned 100 shares when he became a director. Since then he has purchased stock in lots of 20, 50 and 100 shares at prices ranging from $6 to $11 per share. He became aware of the availability of the stock he bought through the quote board and transacted all of his purchases through the corporation.

Arthur Blome, defendant, secretary and a director of Lakefront, owns 11,315 shares of Lakefront stock. Most of the stock was purchased before 1947. All the stock he purchased after 1965 was bought from private individuals and not by use of the quote board.

Irma Elmore, defendant, vice president and a director of Lakefront owns 15,839 shares of stock. This stock was assigned to her by her husband before his death, though it was not officially transferred to her until after he died. He had endorsed stock certificates to her from time to time. He generally gave her about $3000 worth of stock each year. He sometimes used her money to purchase Lakefront stock. In one instance that she recalled, he prepared a gift tax return for some of the stock in question. All of the stock remained registered in her husband's name while he was alive. He received dividends and executed the proxies he received. She testified that a past president of Lakefront was aware of these assignments of stock as was Lakefront's legal counsel. When her husband died, she had the stock transferred to her name by the transfer agent. She could not do so until that time because she was not a member of the Club. She now has a widow's membership in the Club. She has not purchased any Lakefront Stock since her husband's death.

### Defendants' Failure to Purchase Treasury Stock

Defendant Joseph Scanlan testified Lakefront has not purchased its own stock during his tenure as an officer, as there was not sufficient money available because the corporation had to pay off a large debt. This debt had been reduced from $561,000 in 1966 to $84,000 at the time of the trial. In addition, the corporation has invested $2 million in capital replacements and rehabilitation of the Club premises. Further, he believed that such a purchase was inadvisable because it would increase the stock ownership percentage of all shareholders.

There was no evidence presented regarding a single instance in which defendants prevented a Club member from purchasing Lakefront stock. Each plaintiff was asked if he or anyone else he knew of had actually bid

for stock and been prevented from purchasing the stock. Each plaintiff answered that he knew of no such occasion.

### The Trial Court Judgment

The trial court made specific findings that plaintiffs had failed to prove the essential elements of their third amended complaint. In detail, the court held that plaintiffs had failed to produce any evidence of conspiracy by defendants; failed to prove domination of Lakefront by defendants designed to prevent the Club members from purchasing Lakefront stock; failed to present evidence that any eligible individual was prevented by defendants from purchasing such stock; failed to prove any violation of the corporate bylaws by defendants; and failed to prove that the corporation was in a financial position to purchase its own stock and that it was ever in the best interest of the corporation so to do. In addition, the court found that defendants' purchase of Lakefront stock was in no respect improper; there was no evidence that any Club member was injured by defendants' stock purchases or that defendants profited unduly as a result of those purchases; and, finally, that plaintiffs' failure to file this action until 1972 indicated that they were guilty of laches and their action was therefore barred.

In this court, plaintiffs contend that the trial court erred in failing to give consideration and full application to article XII of Lakefront's bylaws restricting the ownership of stock to members of the Club and mandating wide dissemination of stock ownership among the Club's membership; plaintiffs' evidence established prima facie that their right to the relief sought and therefore the trial court's judgment was contrary to the manifest weight of the evidence; it was error for the trial court to deny admission of expert testimony offered by plaintiffs regarding the workings of the New York and American Stock Exchanges; neither the pleadings nor the proof support the conclusion that plaintiffs are barred by laches. In response, defendants contend that the trial court's judgment was fully supported by the law and the evidence. On their cross-appeal defendants argue that it was an abuse of judicial discretion to deny their motion for attorneys' fees and costs pursuant to section 41 of the Civil Practice Act. In response, plaintiffs argue that costs and fees should not be taxed against them.

For a complete grasp of the legal issues here, it is essential to consider portions of article XII of the Lakefront bylaws. This article remained in full force and effect during all times material hereto. The entire enactment consists of approximately five pages of closely typewritten material. In our opinion, a proper disposition of this appeal does not require that it be reproduced here in full. An attempted summary is sufficient for our purposes.

The bylaw sets up, in quite a prolix manner, a procedure intended to cover disposition of Lakefront stock by assignment of the owner or upon death of the owner, or in the event of acquisition of the stock by persons other than a member of the Club. It is provided that in each and all of these situations no stock shall be sold or transferred unless an offer is made to sell the stock to Lake Shore. The corporation is then granted 60 days for exercise of the right of first refusal. There are detailed provisions as to the manner in which purchase by the corporation is to be accomplished in these circumstances. This right of first refusal also permits Lake Shore to sell the stock during the designated period to a dues-paying member of the Club. It is then provided that upon expiration of the 60-day period without purchase of the stock the offeror may during the following 60-day period dispose of the stock without restriction. If this second 60-day period elapses without sale, all of the restrictions previously noted to sale of the stock are to be reapplied. It is provided that any sale or transfer of the stock in violation of the bylaws shall be wholly void. In addition, in such case the corporation may by resolution of its board of directors cancel certificates acquired as a result of violation upon paying the owner thereof the current price. As above noted, the statement is also made in this article that its purpose is to confine the ownership of Lake Shore stock to dues-paying members of the Club and thus to accomplish widespread ownership of Lake Shore stock among the members of the Club.

The bylaw also provides for the mandatory fixing of a price which is to govern all transfers of stock. It provides that within 90 days after the close of each fiscal year of Lake Shore, or at such other times as the board of directors shall deem advisable, the official price of the stock is to be calculated by a computation consisting of a series of designated steps. It is sufficient to state that this computation requires the services of a certified accountant or a person having equivalent knowledge. In his findings of fact regarding this bylaw, the trial court described its provisions as being "inconsistent, conflicting and ambiguous in various respects * * * [and] impractical of literal enforcement insofar as the object of the bylaws is to restrict ownership solely to eligible dues-paying members of Lake Shore Club."

We will summarize the evidence bearing on this phase of the case by stating that it shows that this bylaw was more honored in breach than in its observance. Only upon one occasion did the corporation resort to the assistance of an auditory to tread the path of the detailed computations required to fix the price. At that time, in 1957, the price was fixed at $6.06. However, all Club members were expressly informed by letter from the president of the Club and of Lakefront that this figure was not a binding price but was merely an indication of the value of the stock. In addition, there was testimony that this price was hardly ever put to actual use and

that stock was purchased and sold from time to time at higher prices. The record also shows that a firm of certified accountants retained by defendants made a calculation of the prescribed price of the stock in accordance with the formula of the bylaw for the years 1965 through 1973. The result was a price of 44¢ per share for the year 1973, 61¢ per share for 1970 and various amounts for the remaining years with none higher than $4.32 fixed for the price in 1967.

■■ When defendants moved for a finding in their favor (Ill. Rev. Stat. 1975, ch. 110, par. 64(3)), the trial court was required to consider the weight and quality of the evidence and "to pass on the credibility of the witnesses * * *. * * * The court was not to consider the evidence in the light most favorable to the plaintiff." (*City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57, 58, 349 N.E.2d 399.) On appeal, this court must examine the evidence and decide whether the trial court's finding is manifestly erroneous. *Chappell v. Juergens* (1973), 11 Ill. App. 3d 479, 473, 297 N.E.2d 270.

■■ Plaintiffs initially contend that defendants' purchase of Lakefront stock constituted a breach of their fiduciary duty as directors of Lakefront. A corporate director is permitted to purchase stock of the corporation with which he is affiliated as freely and on the same terms as if he were a stranger to the corporation. This principle is discussed in full in *Anchor Realty & Investment Co. v. Rafferty* (1941), 308 Ill. App. 484, 498-99, 32 N.E.2d 394, which also cited *Hooker v. Midland Steel Co.* (1905), 215 Ill. 444, 451, 74 N.E. 445, and *Bawden v. Taylor* (1912), 254 Ill. 464, 467, 98 N.E. 941.

Plaintiffs are apparently aware of the binding force of this principle. They seek to circumvent its application to the case before us by depending upon authorities involving situations in which a director usurps an opportunity of his corporation to purchase its shares for its own benefit.

■■ In *Northwestern Terra Cotta Corp. v. Wilson* (1966), 74 Ill. App. 2d 38, 219 N.E.2d 860, cited by plaintiffs, a corporate director purchased a large block of his corporation's stock. The corporation had previously refused to purchase this stock at the $7 per share price which defendant had paid. The court determined that the evidence did not support the corporation's claim that it was genuinely interested in buying the stock at the seller's asking price prior to defendant's purchase. As in the case at bar, the court determined that the corporate opportunity principle was inapplicable to the facts before it.

In *Faraclas v. City Vending Co.* (1963), 232 Md. 457, 194 A.2d 298, also cited by plaintiffs, the corporation actually resolved to purchase certain of its own stock by unanimous vote of its directors. The designated price was fixed at $15,000. Although the stock was never delivered to the

corporation, it was cancelled on the corporate books. New counsel for the company advised one of the directors that this transaction was invalid. This director then privately acquired the stock for $250. This simple statement of the facts completely distinguishes the case.

The other cases cited by plaintiffs to support this aspect of their argument involve situations in which a corporate director either usurped the corporation's opportunity to enter into a financial transaction, quite apart from the purchase of its own stock, or entered into a transaction with the corporation directly involving purchase or sale of corporate property. Those cases are all inapposite here and we need not comment on them.

The only testimony regarding the circumstances surrounding Lakefront's failure to increase its holdings of treasury stock was that of defendant Joseph Scanlan. He testified that during his tenure the corporation did not have sufficient money to acquire its own stock. Corporate moneys were being used to repay a large corporate debt and to improve the Club facilities for the benefit of all members. Furthermore Mr. Scanlan pointed out that such purchases of stock would increase the percentages of stock ownership held by himself and the other directors; the very result of which plaintiffs complain in this action. In addition, it seems to us that purchase of large quantities of corporate stock by the corporation would tend to thwart the announced corporate goal of dissemination of stock among Club members.

■■ We are in complete accord with the trial court's conclusion that the language of article XII of the bylaws is ambiguous. The bylaw attempts to restrict ownership of Lakefront stock to Club members while at the same time it attempts to encourage distribution of stock ownership among as many Club members as possible. Yet the bylaw also includes a provision whereby a stockholder can sell his Lakefront stock to a nonmember of the Club, after offering the stock to the Club members and to the corporation itself for a certain period of time. There is no language which limits the amount of stock any individual may own. The continued operation of the quote board, the secretary's attempts to inform Club members of available stock and the practice of notifying former members or heirs of deceased members that they must sell their Lakefront stock all represent good faith attempts made by the corporate directors from time to time to comply with the provisions of this ambiguous bylaw. Though there was some conflicting evidence regarding the operation of the quote board, we cannot say that the apparent conclusion of the trial court regarding its operation is contrary to the manifest weight of the evidence.

■■ The parties to this action agree that the restriction of stock ownership to Club members, an apparent objective of the bylaw, is valid.

However, plaintiffs argue that the bylaw presents an exclusive method for sale of Lakefront stock. It is instructive to note that the bylaw states:

"(A) Except as hereinafter provided, no stock of this corporation shall be sold, assigned, transferred, pledged, donated, or otherwise disposed of except to an individual who at the time of such disposition is a dues-paying member of Lake Shore Club of Chicago, or to this corporation."

This section clearly indicates that the bylaw does not establish an exclusive method of buying and selling Lakefront stock and does not preclude direct transfer of stock between Club members. This interpretation is supported by testimony of several witnesses that it has been common practice for Lakefront shareholders to sell their stock directly to other Club members without using the corporation as a conduit. The evidence shows that William Berry, neither a director nor a defendant, had acquired almost all of his 11,000 shares by direct negotiation with and purchase from other shareholders. The presence of the word "except" in two clauses of the same sentence would seem to support this resolution of the ambiguity.

There is also evidence that it has been Lakefront's policy to permit a widow of a Club member to retain stock she has inherited from her husband, provided that she becomes a Club member. Defendant Irma Elmore, who inherited stock from her husband and proceeded to join the Club, testified that she had not been a member of the Club while her husband was alive because she had been able to use the Club facilities and there was no point in payment of dues by both of them. Hence, her husband never formally transferred any stock to her for purposes of the corporation's records. Other widows have become members of the Club after their husbands died and retained the Lakefront stock owned by the deceased.

■■ We see no reason for the court to give a construction or interpretation to corporate bylaws different from that which the corporation itself has given them throughout years of its existence. (See *In re Estate of Hill* (1963), 42 Ill. App. 2d 396, 407, 192 N.E.2d 429.) This is in accord with the rule that the construction of an ambiguous bylaw by a corporation will be recognized and adopted by the courts. (*Joy v. Ditto, Inc.* (1934), 356 Ill. 348, 357, 190 N.E. 671.) Therefore, we do not believe that such transfers of stock to a widow or other surviving member of the immediate family of a deceased shareholder constitute transfers to a nonmember of the Club in contravention of the bylaw.

■■ Plaintiffs further urge that defendants' failure to establish a trading price for Lakefront stock, pursuant to the formula included in the bylaw, was another instance of violation of their fiduciary duty. The facts above recited regarding the computation of the trading price for the years from

1965 to 1973 at ridiculously low levels demonstrate graphically that it is indeed fortunate for Lakefront and for the Club that the official formula was never used. The use of such figures would have had a disastrous effect on the market for Lakefront stock.

■■ Viewing the totality of the evidence presented on the issue of defendants' breach of their fiduciary duty, we find no violation of this duty and no damage to the corporation or its shareholders as a result of the manner in which these defendants performed their duties as directors of Lakefront. When asked at trial, none of the plaintiffs was able to point to a single instance in which any of the defendants prevented any individual from purchasing Lakefront stock. Though the number of shareholders has decreased, so has the Club's membership. This decrease in membership, combined with the fact that the Club's option to buy Lakefront's assets necessarily put a ceiling on the value of the building, might well have contributed to the lack of interest in purchasing Lakefront stock on the part of many Club members. In any event, the evidence clearly supports the trial court's conclusion that defendants were not responsible for the failure of Club members to purchase stock.

■■ Plaintiffs contend that once they have proved that defendants are in a fiduciary relationship to Lakefront, the burden of proof shifts to defendants to prove that they did not breach their fiduciary duties. In this contention plaintiffs rely upon the principle that directors of a corporation in dealing with corporate property have a fiduciary relationship to the shareholders. Plaintiffs cite and depend upon the classic cases such as *Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 108-09, 67 N.E.2d 265. The validity of this proposition is beyond argument. However, it has no application to the case before us. In connection with the stock purchased by defendants here involved, defendants were not acting in a fiduciary capacity with plaintiffs or other shareholders of Lakefront. We are not dealing here with corporate property or even with a corporate business opportunity. We are concerned only with sale of stock between individuals regarding which no confidential or fiduciary relationship existed. These plaintiffs and defendants were never in any fiduciary relationship regarding transfer of Lakefront stock. See *Anchor Realty & Investment Co. v. Rafferty* (1941), 308 Ill. App. 484, 499, 32 N.E.2d 394.

Thus, in view of the particular nature of the transactions here involved, it follows that the burden of proof rested upon plaintiffs to prove the existence of a fiduciary relationship by evidence which is "clear and convincing and so strong, unequivocal and unmistaking as to lead to but one conclusion." (*Perry v. Wyeth* (1962), 25 Ill. 2d 250, 253, 184 N.E.2d 861.) On this basis we approve of the result reached by the trial court.

It should be added that in our opinion plaintiffs' own proof convinces

affirmatively that none of these defendants acted in violation of any legal or equitable duty toward any of the plaintiffs. Consequently we approve the determination by the trial court that the evidence presented by plaintiffs themselves obviated the need for defendants to present any further evidence.

Plaintiffs also contend that the establishment of a conspiracy need not be shown by an actual agreement between the parties but can be inferred from their actions. This statement is correct as a matter of abstract law. It is equally correct as a matter of law that existence of a conspiracy must be proved by clear and convincing evidence. See the cases in *Rosee v. Board of Trade* (1976), 43 Ill. App. 3d 203, 239, 356 N.E.2d 1012.

■■■ We agree with the result specifically reached by the trial court that plaintiffs failed completely to establish existence of any conspiracy. Furthermore, as there is no evidence of any wrongdoing by defendants or of any damage to plaintiffs as Lakefront shareholders, it follows that the mere existence of a conspiracy would be irrelevant to this action. See *Young v. Hansen* (1969), 118 Ill. App. 2d 1, 7, 249 N.E.2d 300, *appeal denied*, 42 Ill. 2d 584; *Ammons v. Jet Credit Sales, Inc.* (1962), 34 Ill. App. 2d 456, 465, 181 N.E.2d 601.

Finally, plaintiffs argue that the trial court erred in excluding the testimony of an expert witness who was familiar with the operations of the New York and American Stock Exchanges. This testimony was offered in an attempt to draw an analogy between the "specialist function" of maintaining a market in certain shares traded on these national exchanges and the functions of defendants with regard to trading of Lakefront stock. The witness appeared to have little familiarity with stock transactions in the context of a private social club as involved in the instant case. The trial judge excluded this testimony for the correct reason that the situation in the major or stock exchanges is so different from that in the small restricted market for Lakefront stock that the analogy lacks probative value.

■■ Therefore, the trial court did not abuse his discretion by excluding the testimony of this expert. This court will not reverse such an exercise of discretion regarding the qualifications of an expert witness unless it has been manifestly abused. (*Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 279-80, 274 N.E.2d 178, *appeal denied*, 49 Ill. 2d 575.) The qualifications of this expert may have been adequate concerning operation of a national stock exchange but they had no relationship to the problems confronting Lakefront. (Compare *Gibson v. Healy Brothers & Co.* (1969), 109 Ill. App. 2d 342, 353, 248 N.E.2d 771.) In this instance no purpose would have been served by permitting this expert testimony to be included in the evidence considered by the trial court.

Because of our conclusions, as stated above, we need not consider plaintiffs' contentions regarding laches.

■■ In the case before us, the record certified by the clerk of the circuit court consists of 850 pages. The report of proceedings comprises approximately 1000 pages. The so-called excerpts from the record prepared and filed by counsel for appellants consists simply of a complete photocopy of the entire report of proceedings without including any portion of the clerk's record. We regard this treatment of the appeal as a complete violation of Rule 342 of the Supreme Court of Illinois. (Ill. Rev. Stat. 1975, ch. 110A, par. 342.) No motion was made by defendants to strike these purported excerpts or to require plaintiffs to comply with the rule. In our opinion, this type of presentation by counsel for plaintiffs is equivalent to complete failure to file an abstract or excerpts which would warrant dismissal of this appeal. See *Dunlap v. Marshall Field & Co.* (1975), 27 Ill. App. 3d 628, 634, 327 N.E.2d 16.

In any event, the judgment order appealed from is affirmed.

It remains to consider the cross-appeal of defendants in connection with their motion for assessment of costs and attorneys' fees against plaintiffs. (Ill. Rev. Stat. 1975, ch. 110, par. 41.) It is defendants' theory here that plaintiffs became fully aware of all of the pertinent facts by discovery procedures and thus ascertained that there was no evidence with which to support charges of conspiracy or misfeasance against defendants. Despite this knowledge plaintiffs persisted in filing their third amended complaint which alleged that defendants were guilty of conspiracy, had acquired stock in Lakefront by improper methods and had prevented others from acquiring such stock. Plaintiffs cite *Ready v. Ready* (1961), 33 Ill. App. 2d 145, 178 N.E.2d 650, as pointing out that section 41 of the Civil Practice Act provides a method for redress against litigants who plead false or frivolous matters and thereby place the burden and expense of defense upon their opponents.

In the case before us, defendants filed their motion for taxation of fees on June 4, 1975. On September 30, 1975, plaintiffs filed a motion to strike defendants' motion under section 41. The motion to strike averred that the trial court lost jurisdiction to entertain the section 41 motion during pendency of the appeal. Defendants filed a brief in opposition to the plaintiffs' motion to strike. On October 27, 1975, plaintiffs filed a restated and amended motion to strike which also averred alternatively that defendants' motion did not plead ultimate facts but rather stated bare conclusions which were negated by the failure of the judgment order to find that facts alleged by plaintiffs in their pleadings were untrue or were made in bad faith without reasonable cause. Plaintiffs also filed a brief in support of their motion to strike.

■■ Defendants contend that the persistence of plaintiffs in filing

their amended pleadings and their refusal to discontinue this litigation is sufficient basis for the taxation of costs and fees against plaintiffs and that the court abused its discretion by refusing to hold a hearing on this issue. In *Murczek v. Powers Label Co.* (1975), 31 Ill. App. 3d 939, 943, 335 N.E.2d 172, this court pointed out section 41 is penal in nature and should therefore be invoked only in those cases falling strictly within its terms. We pointed out that relief under this section requires proof that the allegations in question were made without reasonable cause; were not in good faith and were untrue. In addition, this court pointed out that the granting of relief under section 41 rests entirely within the discretion of the trial court which is not required to grant the relief sought even if it finds that allegations by a plaintiff were frivolous and made in bad faith. See also *Thomas v. Thomas* (1974), 23 Ill. App. 3d 936, 939, 321 N.E.2d 159.

In the case before us, the trial judge spent a considerable length of time in hearing all of the evidence. The remarks which the trial court made prior to the entry of the judgment order and the detailed findings in that order demonstrate to us that the trial court had a thorough and complete grasp of all of the problems presented by this difficult litigation. In addition, this record reflects that the trial court did hold a hearing on the subject of the section 41 petition. On November 17, 1975, the trial court entered the order which is the subject of the cross appeal. This order recited that the trial court considered the briefs of counsel for all parties as well as the pleadings, the evidence presented by plaintiffs upon trial of the above cause and that the court was "otherwise fully advised in such cause." The court found that defendants do not have a basis in law to entitle them to have their costs or attorneys' fees taxed against plaintiffs and the motion of defendants was therefore dismissed with prejudice.

■■ The type of hearing that is required as a prerequisite to the taxation of costs under section 41 varies with all of the circumstances surrounding the motion. In *Brokaw Hospital v. Circuit Court* (1972), 52 Ill. 2d 182, 287 N.E.2d 472, the falsity of the assertions in the questioned pleadings "was immediately apparent upon inspection of the two documents, and they could not have been made in good faith." (52 Ill. 2d 182, 185.) In *Malone v. Checker Taxi Co.* (1972), 3 Ill. App. 3d 1040, 279 N.E.2d 738, the trial court apparently denied the motion for taxation of fees without a hearing of any kind. In the case before us, a complete hearing concerning the subject matter of defendants' motion would have involved virtually a retrial of all of the basic issues raised in the pleadings. We do not believe that this was necessary and it is our opinion that the result reached by the trial court was well within the exercise of his sound discretion. Furthermore, in view of the recitals in the order from which the cross-appeal was taken, we will assume "that the decision rendered by the court was the right decision and was justified by the facts before it."

(*Metropolitan Sanitary District v. United States Steel Corp.* (1975), 30 Ill. App. 3d 360, 377, 332 N.E.2d 426, *cert. denied,* 424 U.S. 976, 47 L. Ed. 2d 746, 96 S. Ct. 1482, and other cases there cited. The order involved in the cross appeal is accordingly affirmed.

The judgment order disposing of the litigation is affirmed and on the cross appeal the order denying the motion for taxation of fees and costs under section 41 is also affirmed.

Judgments affirmed.

McGLOON and DUA, JJ., concur.