ANCRAFT PRODUCTS COMPANY, Plaintiff-Appellant, *v.* UNIVERSAL OIL PRODUCTS COMPANY, INC., *et al.*, Defendants-Appellees.

First District (1st Division)    No. 79-1111

Opinion filed May 12, 1980.—Rehearing denied June 30, 1980.

Henehan, Donovan & Isaacson, Ltd., of Chicago (Edward V. Donovan, Jr., and James J. McManus, of counsel), for appellant.

Rooks, Pitts, Fullagar and Poust, of Chicago (Allan S. Ganz and Terrence E. Kiwala, of counsel), for appellees Universal Oil Products Company, Inc., and Martin Sacks.

Judi Fishman and James K. Gardner, both of Chicago (Friedman & Koven, of counsel), for appellee Peerless Metal Fabricators, Inc.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Ancraft Products Company (Ancraft) brought suit against Universal Oil Products Company, Inc. (UOP), Peerless Metal Fabricators, Inc. (Peerless) and Martin Sacks (collectively referred to as defendants). In count I of Ancraft's second amended complaint, Ancraft sought compensatory and punitive damages for an alleged conspiracy by defendants to convert the trade secrets of Ancraft and maliciously to interfere with Ancraft's business relationships. UOP and Sacks and also Peerless filed motions for summary judgment on count I. (Ill. Rev. Stat. 1977, ch. 110, par. 57.) The trial court then allowed Ancraft to take depositions of 15 witnesses. The trial court granted both motions for summary judgment and dismissed count I. Ancraft appeals.

Ancraft is a corporation engaged in design and production of specialized tools and machinery. Ernest W. Nyberg was the president, director and owner of 51 percent of Ancraft's stock. One of the designers and engineers at Ancraft was Arthur W. Virta, who was also an officer and director. He owned 49 percent of Ancraft's stock. Peerless is in the same business as Ancraft. UOP is a purchaser of the type of machinery

produced by Ancraft and Peerless. UOP uses this equipment to produce parts for automobile exhaust systems. Martin Sacks is an employee of UOP.

In 1972, UOP's engineers, Hoyer, Schlesinger, Turner, Inc. (HST), hired Ancraft to build a piece of machinery called a monolith impregnator for UOP. The parts produced by this machine are used by automobile companies in fabrication of catalytic converters for automobile exhaust systems. UOP and its engineers created the design, drawings, specifications and data flow sheets for the monolith impregnator. This information was transmitted to Ancraft which built the machine according to UOP's specifications. These plans were the property of UOP. Nyberg signed a secrecy agreement as president of Ancraft. Ancraft agreed to keep the plans in secrecy and confidence and to return them to HST upon completion of the project.

Ancraft manufactured one laboratory test machine and then a prototype 24-station monolith impregnator. This machine coats a large ceramic block (monolith) with chemicals. Arthur Virta was in control of the project for Ancraft. Also he followed the equipment to UOP's plant in Catoosa, Oklahoma, where he helped UOP personnel install it. Virta made modifications so the monolith machine would operate in harmony with machinery already in the plant.

Once the workability of the monolith machine was established, UOP issued a purchase order to Ancraft for three working models of the machine. The order was issued in May 1973 and delivery was to be made in late 1973 and early 1974. This project constituted the major portion of Ancraft's business in 1973-1974. Ancraft employed Virta's son Edwin, a college student, part-time in the summers as Virta's assistant in the engineering and design of the project as well as several machinists who worked on the fabrication and assembly of the monolith impregnators.

As the three monolith machines were produced and assembled at Ancraft's shop, they were shipped to UPO's plant in Catoosa where they were combined with other equipment in the plant. During this period of time, Virta spent approximately 60 to 70 percent of his time at UPO's plant. It was at the plant that Virta met Martin Sacks in January 1974. Sacks had become UPO's project manager for the Catoosa plant in October or November of 1973. Sacks testified Virta was instrumental in getting the monolith machines to work properly by making modifications at the Catoosa plant to the monolith machines and the other equipment at the plant.

In late 1973 and early 1974, discussions were held between Nyberg and Virta about the possibility of Virta acquiring control of Ancraft. Proposals were exchanged between them and their respective attorneys. The parties met to negotiate such an agreement. However, no agreement

was ever reached. Neither UOP nor its employees were told of this internal dispute at Ancraft at the time negotiations were being held.

In late May 1974, a meeting was held by UOP's management personnel in charge of the monolith project to consider whether or not a similar system could be developed for the impregnation of pellets. That meeting was attended by Martin Sacks. Thereafter, Virta was asked by someone at UOP to submit a bid on behalf of Ancraft for the production of a pellet impregnator machine. It would be used to coat pellets with a chemical solution. This pellet impregnator would be partly like the monolith impregnator but mainly it would be completely new.

The requested proposal was delivered in writing by Virta to Sacks before July 1, 1974; on or about June 24, 1974, the date which appears thereon. Nyberg testified he was never consulted or advised by Virta of the request for this proposal or the fact of its delivery to UOP. Virta testified that when he delivered the proposal to Sacks, he told Sacks Ancraft could do a good job and they would stand by the bid because he delivered it as an agent of Ancraft. Then Virta told Sacks, "I will no longer be employed at Ancraft after the first of the month but you go to them and have this bid there." Virta's projected cost of the new machine was $440,000 of which approximately $100,000 would be for engineering.

John Larson, general manager of UOP's Automotive Parts Division, testified that on July 2, Sacks told him Virta had informed Sacks that he was "now fully and officially separated from Ancraft and wanted to discuss a position of employment with UOP." The next morning, Larson, Sacks and John Witt, purchasing agent for UOP, met to discuss the "Virta situation." Witt testified that at the meeting, it was brought to his attention Virta had terminated his association with Ancraft. The three men felt Virta's departure from Ancraft was a serious matter because "Mr. Virta represented the knowledge about our equipment that was produced at Ancraft"; "someone [else] would have to start from scratch" to acquire the knowledge Virta had; and this would cause a delay in the completion of the Catoosa plant.

Larson further testified that even before he found out Virta was leaving Ancraft, he was thinking of getting a different shop to work on the pellet impregnator because UOP had almost finished its relationship with Ancraft with respect to the monolith impregnators and Larson wanted a better organized shop with a larger capability. When Larson found out Virta was leaving Ancraft, he felt there was no way UOP could justify continuing a supply position with Ancraft because "Ancraft was basically Mr. Virta * * *."

The three men discussed a possible consultantship for Virta. Larson indicated that would be acceptable to him. Larson called the legal department of UOP to determine if UOP was free to hire Virta as a

consultant. The three men met with Virta that afternoon of July 3. Virta testified Sacks and Larson told him they hoped they could use his services in the future and they were conferring with the legal department to make sure there was no conflict of interest. Later, in the "middle of July" UOP called Virta in and told him they had consulted with their attorneys and his hiring as a consultant for UOP was approved.

On July 10, 1974, a meeting was held at Ancraft's plant which was attended by Nyberg, Sacks, Witt and Virta. The purpose was to end confusion as to various purchase orders by UOP for additional parts for the monolith machines. Sacks cancelled a few of the purchase orders. Nyberg testified this was the first time he became aware Virta had ceased his employment with Ancraft.

UOP sent Virta a purchase order for his consultation services on July 22, 1974, which stated he was "to start work in accordance with the Purchase Order July 1, 1974." His duties would include supply of all engineering information required for the construction, operation and maintenance of the pellet impregnator machine, preparation of a list of sources for supply and manufacture of all components, and supervision of the fabrication and assembly of the base components of the impregnator at a shop to be chosen by UOP. Soon thereafter, Virta organized A. W. Virta and Associates, a corporation.

Martin Sacks testified that during this time, UOP began to investigate other machine shops to find an appropriate shop to fabricate the pellet impregnator machine. Sacks called Bruce Petsche, president of Peerless, and told him UOP wanted a bid from Peerless on the machine. Petsche testified that during the phone conversation, he told Sacks he thought Ancraft was building the machine. Sacks told Petsche Art Virta had left Ancraft and he and Virta were investigating possible machine shops and they wanted a bid from Peerless.

Virta testified he suggested to Sacks that UOP use the Taylor Machine Shop in Oklahoma to fabricate the machine. Sacks and Virta went to visit the Taylor shop but found it did not have the machinery or equipment necessary to build the pellet impregnator. When Sacks returned, he had John Witt visit the Peerless shop and investigate it. Witt was satisfied with Peerless.

Petsche testified that at the time Peerless was requested to submit the bid, he did not know the pellet impregnator was similar to anything that had been produced previously by Ancraft. He had only a very vague conception of what the machine would be. He was shown some blueprints and general sketches of floor plans. Petsche did not know anyone else, including Virta, had submitted a bid for production of the pellet impregnator. He had discussions with Sacks and Virta with regard

to the scope of the project. According to Petsche, it was a difficult project to quote because "all the prints were not even done" and "a lot of the design was not even finished."

On or about July 11, 1974, Virta, Bruce Petsche and Lee Petsche, vice president of Peerless, met to put together various aspects of the job and arrive at a bid. Bruce Petsche made notes at the meeting. These notes show the breakdown of estimated costs of building the pellet impregnator. The total cost was estimated in the notes to be $440,000 of which $108,000 would be for engineering costs for the services of Virta. However, due to lack of information concerning the design of the machine, Petsche did not submit a definite cost bid as Virta had done previously. Instead he submitted a time and materials cost quotation by letter dated July 18, 1974. Additional hourly rate schedules were submitted to UOP by Peerless in a letter dated July 20, 1974. Virta testified he never saw the bid thus submitted by Peerless to UOP.

UOP accepted the bid and sent its purchase order to Peerless on July 26, 1974. The purchase order was also based strictly on time and materials. The fabrication of the pellet impregnator was to be based upon "drawings which will be supplied by Arthur W. Virta * * *." It was not until September 10, 1974 that Peerless offered UOP a current approximated cost for the first time. This was after Peerless had already begun production of the machine. The September 10, 1974, estimate was $318,000. The final total charge by Peerless for the machine was $342,761.

Virta set up offices in the Peerless shop. Virta's firm employed James McGinty and Daniel Leshuk, both of whom had previously contracted their services to Ancraft for work on the monolith impregnator, and Virta's son Edwin, who did not begin working for the firm until December 22, 1974. Petsche stated he never learned what UOP paid for Virta's services in connection with the production of the pellet impregnator.

Meanwhile, at Ancraft, the quantity of work steadily decreased after Virta left. The monolith impregnator project was substantially completed in the summer of 1974. Frank Wroblewski, Samuel Gerstein and John Kaleta were all machinists employed by Ancraft on an hourly basis. Wroblewski, the shop foreman, testified that when Virta left Ancraft, he knew there would be little work at Ancraft. He found out through McGinty that Virta had office space at Peerless. Wroblewski called Virta and asked him if Peerless had a machine shop and Virta replied they did. Virta testified Wroblewski asked him if there was any chance he could get a job at Peerless. Virta told him he did not know whether Wroblewski could be hired because Peerless was a union shop. Wroblewski replied he had a union card. Virta told Wroblewski he (Wroblewski) would have

to talk to the people at Peerless and see if they would be willing to hire him. Virta added he did not see any reason why Peerless wouldn't hire Wroblewski because "they had lots of work here."

Gerstein testified he discussed the possibility of leaving Ancraft with Frank Wroblewski and Jim McGinty. Once, Gerstein answered the phone at the Ancraft plant and Virta was on the line. Virta asked if Gerstein had given thought to leaving Ancraft eventually. Gerstein replied he was giving it thought since he knew "the job was running out here * * *." Virta asked if Gerstein "would give any thought to coming out here or coming to work for me." Gerstein replied he "was giving thought to everything right now * * *."

Wroblewski went to see Lee Petsche to talk about possible employment with Peerless. Wroblewski, Gerstein and Kaleta visited the Peerless plant sometime before Labor Day and each filled out an application for employment. They were ultimately hired by Peerless and began working there shortly thereafter. In their affidavits filed with the motions for summary judgment, each man stated that prior to the time he sought employment with Peerless, no one from Peerless contacted him about the possibility of going to work for Peerless. Nyberg never attempted to replace these men with other machinists. At Peerless, the three men worked on the pellet impregnator as well as other projects.

Ancraft has ceased manufacture of any products and Nyberg is its only employee. While Virta was associated with Ancraft, he never signed an agreement which prevented him from going into competition with Ancraft after he left. Virta stated any competent machinist who had the drawings of UOP could physically make the machine based upon those drawings. Virta has entered into an agreement with Nyberg concerning this litigation which includes a mutual covenant not to sue.

In *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 313 N.E.2d 457, our supreme court held:

> "A motion for summary judgment should be granted where there is no genuine issue as to any material fact. The court is to determine the existence or absence of a genuine issue as to any material fact from the affidavits, depositions, admissions, exhibits and pleadings in the case. (*Allen v. Meyer* (1958), 14 Ill. 2d 284, 292; Ill. Rev. Stat. 1973, ch. 110, par. 57.) The facts to be considered by the court are evidentiary facts. (50 Ill. 2d R. 191.) Even though a complaint and answer may purport to raise issues of material fact, if such issues are not further supported by evidentiary facts through affidavits or such, summary judgment is then appropriate. (*Kapka v. Urbaszewski* (1964), 47 Ill. App. 2d 321, 326.) If the party moving for summary judgment supplies facts which, if not contradicted, would entitle such a party to a judgment as a matter

of law, the opposing party cannot rely upon his complaint or answer alone to raise genuine issues of material fact. *Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 587; *People ex rel. Sharp v. City of Chicago* (1958), 13 Ill. 2d 157, 161."

■■ Thus, in the instant case, this court must look to the various affidavits, depositions, admissions, exhibits and pleadings to determine if the issues purportedly raised in Ancraft's second amended complaint are supported by evidentiary facts. The law is clear that " '[a] reviewing court must reverse an order granting summary judgment if it is determined that a material question of fact does exist.' " *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 320-21, 396 N.E.2d 524, quoting *Econo Lease, Inc. v. Noffsinger* (1976), 63 Ill. 2d 390, 393, 349 N.E.2d 1.

In its complaint, Ancraft alleged a conspiracy by defendants to convert its trade secrets, those trade secrets being "the skills, knowledge and experience as embodied in its employees and its development of a *modus operandi* for the production of specialized machinery * * * and such knowledge also consisted of Ancraft's informational data in its cost of production, its sources of supply and its ability to efficiently produce and assemble machinery of the type and kind required by UOP." Ancraft alleged defendants usurped these "trade secrets" by using Ancraft's former employees to engineer and fabricate the pellet impregnator machine.

However, Ancraft did concede in oral argument before this court, and it is apparent from the record, that no protectable trade secrets were misappropriated by any of the defendants. A trade secret has been defined as "a secret *plan* or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 385, 212 N.E.2d 865, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225.) In the instant case, the designs, patents, drawings and other data for the monolith impregnator belonged to UOP, not Ancraft. Nyberg conceded this information was all subject to a secrecy agreement which he himself signed as president of Ancraft. Ancraft was required to keep its knowledge confidential, and to use it solely for the purpose of performing its contract. Ancraft specifically conceded this fact in its brief in this court. While Virta's experience in the engineering of the monolith impregnator and the experience of Wroblewski, Gerstein and Kaleta in the fabrication of the same machine may have augmented their skill to manufacture the pellet impregnator, "[i]t is clear that an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer." (*Schulenburg*, 33 Ill. 2d 379, 387.) These employees took only this general skill with them when they left Ancraft.

■■ Furthermore, Virta's familiarity with potential suppliers of parts for the pellet impregnator due to his work on the monolith machine for Ancraft was not a trade secret. (See *Central Specialties Co. v. Schaefer* (N.D. Ill. 1970), 318 F. Supp. 855, 859-60, citing *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 357, 228 N.E.2d 742.) As for Ancraft's claim that the defendants misappropriated Ancraft's cost of production information through Virta, there is no evidence presented by Ancraft to indicate such information was either secret or was converted. In addition, Peerless' bid for the pellet impregnator did not offer any estimated total cost for the project. The bid and UOP's subsequent purchase order were open-ended and based on time and material costs only. It was not until September 10, 1974, after Peerless had started to manufacture the machine, that Peerless offered UOP an approximation of total cost. Even then, this approximation was underestimated by $24,000.

We conclude there was no conspiracy by the defendants to misappropriate any trade secrets of Ancraft and no such actual appropriation.

■■ ■ In its complaint, Ancraft also alleged defendants conspired to interfere with Ancraft's business relationships by inducing Ancraft's employees to leave Ancraft. It has been held by this court that "[t]he malicious inducement of an employee to terminate his existing employment and enter the employ of another gives rise to a cause of action [citation], and the fact that the contract of employment is terminable at will does not bar recovery." (*B. R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 153, 237 N.E.2d 793.) The elements which establish a prima facie tortious interference are (*City of Rock Falls v. Chicago Title & Trust Co.* (1973), 13 Ill. App. 3d 359, 363, 300 N.E.2d 331, *appeal denied* (1973), 54 Ill. 2d 599; *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568, 579, 366 N.E.2d 561, *appeal denied* (1977), 66 Ill. 2d 642):

(1) existence of a valid business relationship or expectancy;

(2) knowledge of the relationship or expectancy on part of the interferer;

(3) an intentional and malicious interference inducing or causing a breach or termination of the relationship or expectancy;

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

Thus, in the instant case, an essential requirement is some evidence of malicious action on the part of defendants to induce Virta and the other former employees of Ancraft to leave Ancraft. In the absence of an express contract of employment and without malice, principles of free competition prevent liability to a subsequent employer. (See *TAD, Inc. v. Siebert* (1978), 63 Ill. App. 3d 1001, 380 N.E.2d 963, *appeal denied* (1978),

71 Ill. 2d 621.) Ancraft contends the timing of the departure of Virta from Ancraft and Gerstein's testimony relating to his departure from Ancraft indicate that these employees were induced by defendants to terminate their employment with Ancraft.

With respect to the termination of Virta's employment with Ancraft, there is no evidence presented to indicate defendants induced Virta to leave Ancraft. Virta testified he submitted a bid for the pellet impregnator on behalf of Ancraft to Sacks before July 1, 1974, informing Sacks at that time he would be leaving Ancraft on July 1. The bid was dated June 24, 1974. Virta had good cause to leave Ancraft. After a long period of negotiation with Nyberg, Virta could not obtain a controlling interest in the company. As shown, because of the covenant not to sue, there is no issue of any possible liability of Virta to Ancraft. Ancraft has not presented any evidence that UOP or Sacks discussed a position of employment with Virta until after July 1. Larson testified that on July 2, Sacks informed him Virta had left Ancraft and wanted to discuss a position of employment with UOP. It is uncontroverted that Virta approached UOP on this subject. Moreover, it is irrelevant that UOP's purchase order for Virta's consultant services dated July 22 was retroactive to July 1. Virta did not actually commence working with UOP until after the July 3 meeting when UOP's legal counsel approved his hiring. There is no evidence to infer Virta performed any services for any of the defendants prior to the beginning of July, when he left his position at Ancraft.

While Nyberg testified he did not know Virta had left Ancraft until July 10 (when Virta appeared at Ancraft's shop with Sacks and Witt), and that he had made a new proposal to Virta respecting Virta's position at Ancraft as late as July 2, such testimony does not refute the only reasonable inferences that can be made from the evidence presented; which is that none of the defendants induced Virta to terminate his relationship with Ancraft and none of the defendants discussed an employment position with Virta until he informed UOP he had left Ancraft.

Ancraft argues Gerstein's testimony indicates defendants induced Wroblewski, Gerstein and Kaleta to terminate their employment at Ancraft and work for Peerless. In the telephone conversation which Virta initiated with Gerstein, after Virta had started his consulting company, Virta asked Gerstein if he had given any thought to leaving Ancraft and working at Peerless or with him. However, this purported conversation could hardly be considered an inducement to leave Ancraft. Gerstein had then already discussed leaving Ancraft with Wroblewski, who had initiated his search for new employment because there was little work left to do at Ancraft.

Furthermore, the affidavits of the three employees indicate no one

from Peerless contacted them about working for Peerless before they sought other employment. These affidavits are uncontroverted and there is no evidence presented to indicate that any of the defendants attempted to induce Wroblewski, Gerstein or Kaleta to leave Ancraft. These men sought work at Peerless because they were hourly workers and there was little left to do at Ancraft. The record convinces us these men had no specialized knowledge or skills beyond their ability as competent machinists.

Ancraft's allegation defendants destroyed its business by disrupting its business relationship with UOP also has no support from the record. UOP dealt contractually with Ancraft in fabrication of the monolith impregnator machines. However, even Nyberg properly admitted in his testimony that UOP was not bound to do any other business with Ancraft and "UOP has the unqualified right to buy from whoever it pleases."

Larson testified Ancraft did not get the contract for the pellet impregnator because he wanted a larger, more organized shop. He stated that when he found out Virta was leaving Ancraft, he could not justify giving Ancraft the contract. Virta was hired by UOP to engineer the pellet impregnator because UOP was so satisfied with his personal work on the monolith system. Peerless was hired by UOP to fabricate the pellet impregnator after Sacks and Virta investigated the Taylor shop (at Virta's suggestion) and Witt investigated Peerless. Peerless did not contact UOP to solicit its business. Actually Sacks contacted Peerless to request a bid for the pellet impregnator in July, after UOP had already decided not to purchase from Ancraft.

■■ Finally, the conspiracy Ancraft alleges among the defendants " 'does not of itself constitute the allegation of a wrong upon which liability for damages may be predicated. It is the act performed in pursuance of the agreement that may result in liability.' " (*B. R. Paulsen & Co.*, 95 Ill. App. 2d 146, 152, quoting *Bertash Market Co. v. Brown* (1966), 70 Ill. App. 2d 8, 16, 217 N.E.2d 362.) As shown above, Ancraft has failed to support its allegations of conversion of trade secrets and malicious interference with business relationships with evidentiary facts. In this regard, Nyberg testified in his deposition he had no knowledge of and could not "prove anything" concerning participation by Martin Sacks in any conspiracy. Also the record shows Peerless did not induce any employees of Ancraft to leave its service and did not solicit UOP for the contract to work on the pellet impregnator machine.

Therefore, "as there is no evidence of any wrongdoing by defendants * * * it follows that the mere existence of a conspiracy would be irrelevant to this action." (*Voss v. Lakefront Realty Corp.* (1977), 48 Ill. App. 3d 56, 70, 365 N.E.2d 347, *appeal denied* (1977), 66 Ill. 2d 637.) In addition existence of a conspiracy must be proved by "clear and

convincing" evidence. (*Bimba Manufacturing Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 267, 256 N.E.2d 357, *appeal denied* (1970), 44 Ill. 2d 583.) The record here is bare of any evidence of an actual conspiracy by any of the defendants.

We agree with the learned trial judge that no genuine issue as to any material fact is presented by this record so that defendants are entitled to summary judgment. Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

McGLOON and CAMPBELL, JJ., concur.