HI-TEK CONSULTING SERVICES, INC., Plaintiff-Appellant, v. MAX BAR-NAHUM *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—90—2307

Opinion filed August 23, 1991.

Gordon & Gordon, Ltd., of Chicago (Robert E. Gordon and Lisa Thaviu, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Dale G. Wills, and Iren J. Ustel, of counsel), for appellees.

JUSTICE LaPORTA delivered the opinion of the court:

Plaintiff, Hi-Tek Consulting Services, Inc. (Hi-Tek), brought this action against defendants, Max Bar-Nahum and Amoco Corporation, formerly Standard Oil Company of Indiana, alleging that defendant Amoco had tortiously interfered with plaintiff's contractual relationship with Bar-Nahum and had breached its agreement not to hire or solicit the employment of Hi-Tek's employees. The trial court granted summary judgment in favor of Amoco on both counts. Plaintiff has appealed only the trial court's grant of summary judgment on count II of the amended complaint, which asserted tortious interference with plaintiff's contractual relationships.

The record reveals that on February 10, 1984, Hi-Tek and Amoco executed a support services agreement under which Hi-Tek was to provide computer consulting services involved in the installation and implementation of a new computer software product in Amoco's office

computer system. The agreement included a provision which precluded either party from hiring or soliciting the employment of any persons employed by the other contracting party.

The Hi-Tek consultants assigned to work on the Amoco project were Itai Aaronson and Max Bar-Nahum. Aaronson owned 50% of the shares in Hi-Tek and served as its secretary. Wayne Cohen was the president of Hi-Tek and owned the remaining 50% of the shares in the corporation. Bar-Nahum was an employee of Hi-Tek but held no ownership interest in the corporation, and his employment by Hi-Tek was terminable at will.

Amoco also retained the services of Interactive Business Systems (IBS) to provide computer support services for the installation of the new software. IBS rendered essentially the same or similar services as those provided by Hi-Tek, but did so at a lower cost to Amoco.

From May to September 1984, Bar-Nahum worked for Hi-Tek on the Amoco project at the Amoco offices five days each week for eight hours each day. During this period of time, he became acquainted with the other Amoco and IBS consultants who were involved in the project, including Joe Szczubelek. In late August 1984, Bar-Nahum mailed a letter of resignation to Hi-Tek and provided a copy of this letter to Ben Lampert, the supervisor of systems development support for Amoco who was responsible for the new software project.

Bar-Nahum informed Cohen on approximately August 24, 1984, of his intention to leave Hi-Tek and ceased working for Hi-Tek on or about September 7, 1984. On September 13, 1984, Bar-Nahum commenced employment as an independent contractor with IBS and was again assigned to work on the Amoco project. The other IBS independent contractors assigned to this project included Joe Szczubelek and William McAllister.

Thereafter, Hi-Tek instituted this action, claiming that Amoco had breached its contract with Hi-Tek and had tortiously interfered with Hi-Tek's contractual relationship with Bar-Nahum. Amoco filed a motion for summary judgment which was supported by the affidavit of Ben Lampert. The trial court subsequently granted Hi-Tek's request to engage in discovery prior to responding to the summary judgment motion. During this discovery process, interrogatories and requests to produce were served, and the depositions of Ben Lampert, Wayne Cohen, Itai Aaronson, and Max Bar-Nahum were taken.

Cohen testified at his deposition that Bar-Nahum told him he had resigned because he had obtained a "better opportunity." Although Bar-Nahum would not specify the nature of this offer, he made reference to a local opportunity with a company based on the East Coast.

Cohen testified further that when he met with Lampert after Bar-Nahum resigned, Lampert indicated that the Amoco project was at a critical stage and that because Bar-Nahum's continued participation was essential to the project's success, Lampert desired to keep Bar-Nahum working on the project. Cohen also stated that Lampert told him that if Bar-Nahum stayed on the project, there was a very good chance that Bar-Nahum could get a permanent position with Amoco or a management position with one of its subsidiary companies. Although Cohen felt that these comments constituted improper solicitation of employment of Bar-Nahum, Cohen did not complain to Lampert because both Cohen and Lampert were interested in keeping Bar-Nahum on the project.

Cohen testified further that on at least one occasion, Lampert indicated that he wanted Hi-Tek to find employees for Amoco. Cohen also stated that after Hi-Tek had submitted to Amoco the names of Joe Szczubelek and William McAllister as possible members of the Hi-Tek consulting team, these individuals ended up working on the Amoco project for IBS. Cohen testified that after Szczubelek had verbally agreed to work as a subcontractor for Hi-Tek, but before he signed a written agreement, Szczubelek was hired by IBS and assigned to the Amoco project. Cohen acknowledged that Szczubelek and McAllister had never been employees of Hi-Tek and had never performed any services on behalf of Hi-Tek.

Cohen stated further that Lampert attempted to pressure Cohen to lower Hi-Tek's rates and indicated that it was in Amoco's best interests to obtain the same services from the same people at lower rates. Cohen also testified that Lampert had acknowledged that he solicited the employment of Aaronson.

Aaronson testified at his deposition that in February 1984, Lampert and another Amoco employee directly solicited him to work for Amoco while he was at the Omaha office on a project for Hi-Tek. Aaronson also stated that Lampert on other occasions indicated that it would be beneficial if Aaronson either worked for Amoco directly or indirectly through IBS. Aaronson indicated further that Lampert preferred to hire subcontractors through IBS because IBS was under his control. Aaronson also stated that Lampert acknowledged that he had encouraged representatives of IBS to solicit the employees or subcontractors of other consulting firms.

Aaronson testified further that several months before Bar-Nahum resigned from Hi-Tek, Aaronson was present during a conversation between Lampert and Bar-Nahum in which Lampert was discussing the possibility of Bar-Nahum working for Amoco. Aaronson stated

that Lampert was "vaguely discussing [this possibility] without making a direct job offer" to Bar-Nahum.

Lampert testified at his deposition that he had never solicited Bar-Nahum to work for Amoco or for IBS. Lampert testified further that for certain projects, he had the authority to approve the consultants provided by Hi-Tek and by IBS. Lampert met both William McAllister and Joe Szczubelek through IBS. Szczubelek's name and resume were submitted to him by IBS just one day before they were submitted by Hi-Tek. Both McAllister and Szczubelek worked on the Amoco project for IBS before Bar-Nahum left the employ of Hi-Tek.

Lampert's affidavit, filed in support of Amoco's motion for summary judgment, stated that he was the only employee of Amoco who had daily contact with Bar-Nahum and that no offer of employment could or would be made to Bar-Nahum by any authorized employee of Amoco without Lampert's recommendation and approval. Lampert's affidavit stated further that he was not aware of any attempted solicitation or offer of employment to Bar-Nahum by any employee, representative, or agent of Amoco.

At his deposition, Bar-Nahum testified that when he interviewed with Cohen and Aaronson for a position with Hi-Tek, they indicated that he would be a "junior partner," but this arrangement was never formalized in writing, and despite Bar-Nahum's repeated inquiries, he was never made a "junior partner." Bar-Nahum testified further that he decided to leave Hi-Tek for personal reasons which included inadequate compensation, sick leave and vacation days, and the lack of a good social package. Bar-Nahum stated that he was also unhappy because Wayne Cohen had asked him to retain documentation and copies of everything Hi-Tek developed on the Amoco project so that Hi-Tek could eventually package the software to sell to other companies. In addition, Aaronson and Cohen asked Bar-Nahum to do anything in his power to make the other independent consultants working at Amoco look bad. Bar-Nahum did not comply with these requests.

Bar-Nahum testified further that he contacted a number of individuals and firms to investigate employment opportunities. He spoke with Bruce Stopka of IBS and Ben Lampert of Amoco. Lampert told Bar-Nahum that Amoco could not hire him, in part, because of the terms of its support services agreement with Hi-Tek. Bar-Nahum testified that Lampert never solicited him to work for Amoco or for IBS.

Bar-Nahum stated that he interviewed with a firm named Data Services, Incorporated, which was located in Boston, Massachusetts. Bar-Nahum accepted an offer by Data Services for a position in Chicago, but subsequently changed his mind about accepting this posi-

tion. Bar-Nahum was concerned that he might be transferred out of Chicago after the initial Chicago project was completed.

Bar-Nahum then contacted Stopka again and was hired as an independent contractor for IBS. Bar-Nahum was initially assigned to work for IBS on a project for Combined Insurance. Because a problem arose with that assignment, he was subsequently assigned to work at Amoco under a separate consulting agreement between IBS and Amoco. Bar-Nahum began working at Amoco for IBS on September 11, 1984, and continued to work on the Amoco project as a consultant for IBS until June 1985.

Bar-Nahum stated that after he had resigned from Hi-Tek, he met with Wayne Cohen and Ben Lampert. At this meeting, Cohen told Bar-Nahum that Hi-Tek would match any offer he had received, but Bar-Nahum rejected this proposal because he did not want to work for Cohen anymore.

Upon consideration of Amoco's motion for summary judgment, Hi-Tek's response, and the depositions and affidavits presented, the trial court granted summary judgment in favor of Amoco on both counts I and II. As to count II, the court found that Hi-Tek had failed to offer any evidence to rebut the deposition testimony of Bar-Nahum that he left Hi-Tek for personal reasons.

On appeal, Hi-Tek argues that the trial court erred in entering summary judgment in favor of Amoco on count II, which alleged tortious interference with the employment contract between Hi-Tek and Bar-Nahum.

■■ The tort of interference with contractual relations recognizes that a person's business relationships constitute a property interest and are entitled to protection from unjustified tampering by another. *Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 398, 515 N.E.2d 1047, 1051; *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101.

■■ ■ The malicious inducement of an employee to terminate his existing employment and enter the employ of another gives rise to a cause of action, and the fact that the contract of employment is terminable at will does not bar recovery. (*Ancraft Products Co. v. Universal Oil Products Co.* (1980), 84 Ill. App. 3d 836, 844, 405 N.E.2d 1162, 1168; *B.R. Paulsen & Co. v. Lee* (1968), 95 Ill. App. 2d 146, 153, 237 N.E.2d 793, 796.) The elements which establish a *prima facie* case of tortious interference with contractual relations are (1) the existence of a valid and enforceable contract; (2) the defendant's awareness of the contractual relation; (3) the defendant's intentional and unjustified inducement of breach of the contract; (4) a subsequent

breach by the other contracting party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. (*R.J.N. Corp. v. Connelly Food Products, Inc.* (1988), 175 Ill. App. 3d 655, 664-65, 529 N.E.2d 1184, 1190; *Ancraft Products Co.*, 84 Ill. App. 3d at 844, 405 N.E.2d at 1168.) In the absence of a showing of malice or an express contract of employment, principles of free competition prevent liability on the part of a subsequent employer. *Certified Mechanical Contractors, Inc.*, 162 Ill. App. 3d at 400-01, 515 N.E.2d at 1053-54; *Ancraft Products Co.*, 84 Ill. App. 3d at 844, 405 N.E.2d at 1168; *TAD, Inc. v. Siebert* (1978), 63 Ill. App. 3d 1001, 380 N.E.2d 963.

■ Lack of legal justification for the conduct of the defendant is essential in establishing a claim for tortious interference with contractual relations. (*H.F. Philipsborn & Co. v. Suson* (1974), 59 Ill. 2d 465, 474, 322 N.E.2d 45, 50; *R.J.N. Corp.*, 175 Ill. App. 3d at 664-65, 529 N.E.2d at 1190.) The third party claiming the privilege of legal justification must be acting to protect a conflicting interest that is considered to be of equal value to or greater than plaintiff's contractual rights, and the third party's acts to bring about the breach must be legal acts and not unreasonable in the circumstances. *R.J.N. Corp.*, 175 Ill. App. 3d at 665, 529 N.E.2d at 1190.

In the instant case, the trial court was required to consider the various depositions, Lampert's affidavit, the admissions, exhibits, and pleadings to determine whether the issue raised in count II of Hi-Tek's amended complaint was supported by evidentiary facts. Ill. Rev. Stat. 1989, ch. 110, par. 2—1005.

Hi-Tek contends that several circumstances indicate that the trial judge erred in entering summary judgment in favor of Amoco. These circumstances include (1) the short interval of time between his resignation from Hi-Tek and his employment with IBS; (2) the employment of Szczubelek and McAllister by IBS after their names had been submitted by Hi-Tek; (3) the contradictions contained in Bar-Nahum's deposition testimony; and (4) Lampert's prior solicitation of Aaronson. We find this argument unpersuasive.

The trial judge determined that summary judgment in favor of Amoco was proper based upon the evidentiary facts before him. We hold that the record contains ample support for the trial court's conclusion.

Both Lampert and Bar-Nahum testified at their depositions that Bar-Nahum's decision to leave Hi-Tek was made for personal reasons and that there was no inducement or solicitation on the part of Lampert or any other person employed by Amoco. This testimony is uncontradicted. This evidence is corroborated by Bar-Nahum's state-

ments that he was unhappy because Cohen had asked him to retain documentation and copies of everything Hi-Tek developed on the Amoco project so that Hi-Tek could eventually package the software to sell to other companies and because Aaronson and Cohen asked Bar-Nahum to do anything in his power to make the other independent consultants working at Amoco look bad.

Further corroboration for this evidence is found in Bar-Nahum's deposition testimony that he was promised a "junior partnership" which was never formalized in writing and never realized despite Bar-Nahum's repeated inquiries. Moreover, Bar-Nahum testified that while he was investigating employment possibilities, he contacted Lampert, who told him that Amoco could not hire him, in part, because of the terms of its support services agreement with Hi-Tek.

In addition, Cohen testified that when Bar-Nahum resigned, he told Cohen that he had a "better opportunity" with a firm that was based on the East Coast. This testimony corroborates the evidence that Bar-Nahum originally accepted an offer from Data Services, Incorporated, but later changed his mind and contacted Stopka at IBS. Cohen also acknowledged that Szczubelek and McAllister had never been employees of Hi-Tek and had never performed any services on behalf of Hi-Tek. This evidence is in accord with Lampert's testimony that he met both William McAllister and Joe Szczubelek through IBS and that Szczubelek's name had been submitted to him by IBS the day before it was submitted by Hi-Tek.

In addition, the solicitation of Aaronson and the alleged solicitation of Bar-Nahum took place several months before Bar-Nahum actually gave notice and terminated his employment with Hi-Tek. Plaintiff has presented no evidence to establish that Amoco's alleged solicitation of Bar-Nahum actually caused him to leave the employ of Hi-Tek. As previously noted, the trial court found that Bar-Nahum left Hi-Tek for personal reasons, and the record does not include any evidence to the contrary.

A motion for summary judgment should be granted when the pleadings, depositions, admissions, and affidavits establish that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Ill. Rev. Stat. 1987, ch. 110, par. 2–1005; *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398, 415 N.E.2d 397, 402.

█ We hold that the trial court correctly determined that there was no genuine issue of material fact as to whether Bar-Nahum left Hi-Tek's employ for personal reasons. Bar-Nahum's deposition testimony established that he had specific personal reasons which he

clearly identified as his motivation to voluntarily leave Hi-Tek's employ. The deposition testimony filed by Hi-Tek did not discredit this evidence. Bar-Nahum's employment was terminable at will, and he was free to leave the employ of Hi-Tek for any reason. Bar-Nahum specifically denied that he was solicited by Lampert or any other person at Amoco. Based upon the evidence presented, the trial judge could conclude that there had been no intentional and unjustified inducement by Lampert or Amoco to cause Bar-Nahum to breach his employment contract with Hi-Tek. In the absence of these essential elements, the court properly found that Hi-Tek had failed to establish a *prima facie* case of tortious interference with contractual relations and correctly entered summary judgment in favor of Amoco. See *R.J.N. Corp.*, 175 Ill. App. 3d at 664-65, 529 N.E.2d at 1190; *Ancraft Products Co.*, 84 Ill. App. 3d at 845, 405 N.E.2d at 1168.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.