Barry W. SUFRIN, Plaintiff–Appellee, Cross–Appellant,

v.

Gerald D. HOSIER, Defendant– Appellant, Cross–Appellee.

Nos. 97–1132, 97–1241.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1997.

Decided Oct. 27, 1997.

Robert E. Shapiro, Ray G. Rezner (argued), Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for Plaintiff–Appellee, Cross–Appellant.

Paul K. Vickrey, Raymond P. Niro, John C. Janka (argued), Patrick Francis Solon, Niro, Scavone, Haller & Niro, Chicago, IL, for Defendant–Appellant in No. 97–1132.

Paul K. Vickrey, Raymond P. Niro, John C. Janka (argued), Timothy J. Haller, Raymond P. Niro, Jr., Niro, Scavone, Haller & Niro, Chicago, IL, for Defendant–Appellee in No. 97–1241.

Before POSNER, Chief Judge, and BAUER and EVANS, Circuit Judges.

POSNER, Chief Judge.

We have for decision an appeal and a cross-appeal from a split decision in a bitter dispute between two former law partners, Gerald Hosier and Barry Sufrin, patent lawyers who between 1984 and 1989 practiced law as Hosier & Sufrin, Ltd. In 1986 the firm was retained to handle a patent claim of Telesonics Systems Inc. on a contingent-fee basis. The following year Hosier, the more senior of the two lawyers and the one who had "landed" Telesonics as a client, negotiated a lucrative settlement that promised Telesonics tens of millions of dollars of patent-licensing fees. Hosier informed Sufrin that Sufrin would receive 1 percent of the amount of the settlement.

To minimize income tax, the owners of Telesonics created a limited partnership, Telesonics Systems, to receive and distribute the proceeds of the settlement. The limited partnership drew up a written plan of distribution under which the proceeds, as they were received from the patent licensees, would be divided in specified percentages among the partners in the limited partnership and the lawyers. The plan stated that

Sufrin would get 1 percent of the proceeds and Hosier 38.5 percent. When the law firm broke up, Hosier claimed that Sufrin owed him some $100,000 as his share of the costs incident to the breakup, and when Sufrin refused to pay, Hosier told Telesonics Systems (the limited partnership) to withhold further payment of Sufrin's 1 percent share of the licensing revenues because Sufrin wasn't entitled to it. Afraid of taking sides in the dispute, and no doubt reassured by Hosier's promise to indemnify it should it be sued by Sufrin, Telesonics Systems placed the revenues allocable to Sufrin in escrow. Sufrin's first claim in this suit is that Hosier's action constituted tortious interference with Sufrin's contract with the limited partnership. The jury agreed and awarded Sufrin $419,000 in compensatory damages (the amount in escrow, plus interest) and an equal amount in punitive damages. Hosier's appeal is from the judgment for Sufrin on this claim.

Before the firm broke up it had been retained by the well-known inventor Lemelson (who has just died) to prosecute, on a contingent-fee basis, claims of patent infringement against a number of major companies. When the firm broke up, Hosier took Lemelson's business with him. The claims proved to be immensely lucrative, although the lucre did not begin to flow until years after Hosier & Sufrin, Ltd. had dissolved. Sufrin's second claim against Hosier, based on the written agreement specifying the compensation of the partners (we'll call this the "partnership agreement"), is to roughly a third of the contingent fees generated by the Lemelson retention. So huge are those fees that if Sufrin prevailed Hosier would owe him more than $70 million. The jury, however, gave judgment for Hosier on this claim, precipitating the cross-appeal.

The two claims are related in the following way: Hosier argues that Sufrin had no contract with Telesonics because Sufrin's 1 percent interest in the settlement was a "gift" from Hosier because (Hosier contends) the partnership agreement did not entitle Sufrin to any share of the contingent fees that the firm obtained. We shall see that Hosier is right about the agreement, although, as we

are about to see, it doesn't follow that there was no contract between Sufrin and Telesonics. Still, there is tension between Sufrin's two claims, the Telesonics claim and the Lemelson claim. For if Sufrin was entitled to a third of the law firm's contingent fees (the Lemelson claim), why was he content with a measly 2.5 percent of the contingent fee in the Telesonics matter? (Sufrin's 1 percent of the licensing fees was approximately 2.5 percent of the total contingent fee to which Hosier & Sufrin, Ltd. was entitled by its contract with the Telesonics corporation.) Sufrin's answer, which must not have persuaded the jury, is that Hosier may have been retained by Telesonics before the formation of the law firm and that Sufrin accepted a mere 1 percent of the Telesonics settlement to avoid having to litigate the issue whether Telesonics was the firm's client or Hosier's.

It may seem curious that Sufrin should have conceded, as he has, that if he had no contract with Telesonics, he cannot prevail on his claim of tortious interference. The tort is not limited to interfering with a contract. As usually formulated, in Illinois (whose law governs the substantive issues in this diversity suit) as elsewhere, the tort consists either of interfering with an existing contract or interfering with a prospective advantage, that is, with the plaintiff's reasonable expectation of entering into a relation formally or informally contractual. See *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 656–57, 568 N.E.2d 870, 877–78 (1991); *Dowd & Dowd, Ltd. v. Gleason*, 284 Ill.App.3d 915, 220 Ill.Dec. 37, 48, 672 N.E.2d 854, 865 (1996), appeal allowed, 171 Ill.2d 564, 222 Ill.Dec. 430, 677 N.E.2d 964 (1997).

Although Sufrin was not in the negotiation or expectancy stage of his relation with Telesonics, the cases protect the expectation of the *continuation* of an advantageous relation even if, as in *Fellhauer*, a case involving employment at will, the victim of the interference has no contractual entitlement to the continuation. And while it is true that if Hosier is right, and Sufrin had no contract with Telesonics, Hosier is probably also right that Telesonics was merely the conduit for a gift from Hosier to Sufrin, the Illinois courts have provided relief against tortious interference with the expectation of a bequest, *In re Estate of Roeseler*, 287 Ill.App.3d 1003, 223 Ill.Dec. 208, 221, 679 N.E.2d 393, 406 (1997); *Nemeth v. Banhalmi*, 99 Ill.App.3d 493, 55 Ill.Dec. 14, 17–18, 425 N.E.2d 1187, 1190–91 (1981), and a bequest is a type of gift, and the secondary authorities agree that tortious interference with a gift is actionable. *Restatement (Second) of Torts* § 774B (1979); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 130, p. 1007 (5th ed.1984). Sufrin may have been worried that if he acknowledged even the possibility that he had had no entitlement to any part of the contingent fee in the Telesonics matter, it would have fatally undermined the credibility of his claim to a much larger share of the Lemelson fees. At all events, with Sufrin for whatever reason having confined his tort claim to interference with a contract, see *Resudek v. Sberna*, 132 Ill.App.3d 783, 87 Ill.Dec. 663, 668, 477 N.E.2d 789, 794 (1985), we must decide whether Sufrin had a contract with Telesonics.

He did. Even if the 1 percent was a pure gift by Hosier to Sufrin, it became a contractual entitlement of Sufrin against Telesonics with which Hosier interfered. The Telesonics corporation had a contractual obligation, running to Hosier & Sufrin, Ltd., to pay the contingent fee that the firm had earned by its representation of the corporation. The obligation ran to the law firm, whatever arrangements the partners may have had for divvying up the spoils. The firm surrendered its undoubted contractual right in exchange for the agreement of the Telesonics partnership to distribute the contingent fees in a specified manner that included Sufrin's 1 percent. It was as if Hosier had through sheer love deposited money in a joint bank account in his and Sufrin's names; the bank would be contractually obligated to Sufrin to honor Sufrin's draws against the account, regardless of whether Sufrin had given Hosier consideration for opening the joint account. *Landretto v. First Trust & Savings Bank*, 333 Ill. 442, 164 N.E. 836 (1928); *Speasl v. National Bank*, 37 Ill.App.2d 384, 186 N.E.2d 84, 86 (1962); *Copeland v. Peachtree Bank & Trust Co.*, 150

Ga.App. 262, 257 S.E.2d 353 (1979). In technical legal terms, Hosier and Sufrin were third-party beneficiaries of the contract between Hosier & Sufrin, Ltd. and Telesonics Systems Inc., because the intention of the parties to the contract was to confer a legally enforceable right or benefit on the two lawyers. *XL Disposal Corp. v. John Sexton Contractors Co.*, 168 Ill.2d 355, 213 Ill.Dec. 665, 669, 659 N.E.2d 1312, 1316 (1995); *MBD Enterprises, Inc. v. American National Bank*, 275 Ill.App.3d 164, 211 Ill.Dec. 678, 655 N.E.2d 1061 (1995); *Paukovitz v. Imperial Homes, Inc.*, 271 Ill.App.3d 1037, 208 Ill.Dec. 417, 419, 649 N.E.2d 473, 475 (1995); *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 219–20 (7th Cir.1996) (Michigan law). To see how clear this intention was, just imagine how Hosier would have squawked if Telesonics had used the logic of his argument as grounds for denying that it had any contractual obligation to pay him his 38.5 percent of the licensing fees. If Hosier was a third-party beneficiary of the law firm's contract with Telesonics Systems, so was Sufrin, regardless of the origin of his entitlement.

■ Hosier argues that under Illinois law it is impossible to interfere tortiously with a contract to which you are a party, and Hosier was a party to the distribution agreement. He is right that if you break a contract, you cannot be sued for tortiously interfering with that contract. *Douglas Theater Corp. v. Chicago Title & Trust Co.*, 288 Ill.App.3d 880, 224 Ill.Dec. 249, 252, 681 N.E.2d 564, 567 (1997); *Quist v. Board of Trustees*, 258 Ill. App.3d 814, 196 Ill.Dec. 262, 266–67, 629 N.E.2d 807, 811–12 (1994). For that would make every breach of contract a tort. This case is different. Telesonics had independent contractual obligations to Hosier and to Sufrin, and Hosier had no greater right to interfere with the obligation to Sufrin than he would have had if that obligation had been set forth on a separate piece of paper. We cannot find a published judicial opinion on the question, but the answer seems clear as a matter of principle. Indeed, cases in which the parties to a tortious interference suit have contractual claims against the same obligor, or the expectation of a bequest from the same testator, are ones in which the temptation to tortious interference might seem especially great, although the dearth of cases suggests not.

■ A more difficult question is whether Illinois law allows the award of punitive damages in a case such as this. The mere fact that interference with contract is an intentional tort does not make an award of punitive damages permissible in Illinois; the defendant's misconduct must be worse than the minimum required to be guilty of the tort for an award of punitive damages to be proper. We so held in *Anthony v. Security Pacific Financial Services, Inc.*, 75 F.3d 311, 316–17 (7th Cir.1996), citing Illinois cases and Seventh Circuit cases interpreting Illinois law (like *Anthony* itself). See also *Getschow v. Commonwealth Edison Co.*, 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984) (per curiam). But a rational jury could have found that Hosier's conduct was worse than the minimum required because it had a flavor of extortion, and extortion is not an element of the tort of intentional interference with contract. Suppose, to take a common illustration of the tort, that the defendant hires away an employee of the plaintiff knowing that the latter has a contract with his current employer. E.g., *Hi–Tek Consulting Services, Inc. v. Bar–Nahum*, 218 Ill.App.3d 836, 161 Ill.Dec. 347, 351, 578 N.E.2d 993, 997 (1991); *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 90 Ill. App.3d 817, 46 Ill.Dec. 186, 192–93, 413 N.E.2d 1299, 1305–06 (1980). There is nothing extortionate about the defendant's conduct in such a case. Here the defendant interfered with the plaintiff's contract in order to put pressure on the plaintiff to knuckle under to an unrelated demand. Hosier calls this a setoff. It was not. Hosier did not owe the 1 percent to Sufrin; the very foundation of his defense to Sufrin's second claim is that he had no obligation to Sufrin. Since he owed Sufrin nothing, he could not offset a debt to Sufrin against a debt of Sufrin to him. He caused money owed by another to Sufrin to be withheld in order to pressure Sufrin to pay him. At argument Hosier's lawyer compared this tactic to garnishment. For garnishment, however, you need a judgment, which Hosier didn't have.

■ Extortion is the use of threats to obtain leverage in a situation in which the victim of the threat has no feasible legal remedy, and the condition that there be "no feasible remedy," on which see our recent decision in *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 579–80 (7th Cir.1997), and the cases cited there, may seem absent here. It would have been feasible for Sufrin to sue Telesonics Systems for the fees that it withheld from him; several hundred thousand dollars were at stake. But the attorneys' fees that he would have incurred in that litigation would have been on top of the fees that he would have incurred in fighting Hosier over the $100,000 that Hosier claimed Sufrin owed him. By forcing Sufrin to fight on two fronts (or rather threatening Sufrin with such a fight, for in fact Hosier did not sue him for the $100,000 until Sufrin brought this suit), Hosier was bringing financial pressure on Sufrin to settle their dispute on terms favorable to Hosier, and he was doing it by improper, because tortious, means. This behavior may not have reached the level of extortion or duress in their technical legal sense—it was surely not criminal extortion—but it was, as we said, extortionate. And though absence of financial hardship to Sufrin may have weighed against the award of punitive damages, Hosier's greed weighed in favor of it: here was a lawyer who was receiving hundreds of millions of dollars in attorneys' fees yet thought it appropriate to commit a tort in order to squeeze what to him was an almost nominal amount of money from a former partner. Hosier bragged about his aggressiveness and the jury was entitled to consider that in determining the egregiousness of his tortious conduct. In these circumstances, a rational jury could conclude that Hosier did not merely commit your garden-variety intentional-interference tort, which as we have seen would not be enough to warrant awarding punitive damages, but an aggravated form of the tort, as in other intentional-interference cases in Illinois in which punitive-damages awards have been upheld. *Hill v. Names & Addresses, Inc.*, 212 Ill.App.3d 1065, 157 Ill.Dec. 66, 79, 571 N.E.2d 1085, 1098 (1991); *Embassy/Main Auto Leasing Co. v. C.A.R. Leasing,*

*Inc.*, 155 Ill.App.3d 427, 108 Ill.Dec. 170, 174, 508 N.E.2d 331, 335 (1987); *Smith–Shrader Co. v. Smith*, 136 Ill.App.3d 571, 91 Ill.Dec. 1, 8, 483 N.E.2d 283, 290 (1985); *Stafford v. Puro*, 63 F.3d 1436, 1443–44 (7th Cir.1995) (applying Illinois law).

■ We need not decide exactly how aggravated a defendant's commission of the tort of intentional interference with contract must be in order to make his conduct "outrageous," which the Supreme Court of Illinois, following the *Restatement*, says the defendant's conduct must be to warrant an award of punitive damages. *Loitz v. Remington Arms Co.*, 138 Ill.2d 404, 150 Ill.Dec. 510, 515, 563 N.E.2d 397, 402 (1990), quoting *Restatement, supra*, § 908 comment b. The concept of the "outrageous" is vague. Its context in the *Restatement* suggests that it may mean no more than grossly negligent. In that event it might authorize the award of punitive damages in all cases of intentional tort, which the Illinois courts refuse to do. But in the present case awarding punitive damages can be justified on pragmatic grounds, as necessary for adequate deterrence, a recognized goal of such an award that does not require speculation on the meaning of "outrageous." *Loitz v. Remington Arms Co., supra*, 150 Ill.Dec. at 515, 563 N.E.2d at 402; *Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir.1996); *Restatement, supra*, § 908 comment b. Where the defendant's conduct is extortionate, it is possible that without the prospect of punitive damages the plaintiff would knuckle under to the threat rather than fight. Limited to a necessarily uncertain prospect of merely compensatory damages, which might leave him with little after the payment of attorneys' fees, Sufrin might have decided to settle with Hosier on terms unduly advantageous to the latter in order to continue receiving his substantial earnings stream from Telesonics. Had Sufrin settled on such terms, Hosier's extortionate tactics would have been vindicated. The award of punitive damages in circumstances in which they are necessary to give the victim of tortious misconduct the backbone needed to stand up against a bully seems to us, and we are confident to the Illinois courts as well,

appropriate. *Kemezy v. Peters, supra,* 79 F.3d at 34–35.

■ In support of the second claim, Sufrin asks us to delve deeply into the law governing the rights of lawyers when a law firm breaks up. We decline the invitation. The "common law of law firms," as Sufrin describes it, is a specialized body of contract law designed, as most contract law is, to supply a set of standard terms for cases in which the parties' contract is incomplete. *Borys v. Rudd,* 207 Ill.App.3d 610, 152 Ill. Dec. 623, 566 N.E.2d 310 (1991); *Nelson v. Warnke,* 122 Ill.App.3d 381, 77 Ill.Dec. 900, 461 N.E.2d 523 (1984); *Froemming v. Gate City Federal Savings & Loan Ass'n,* 822 F.2d 723, 731 n. 11 (8th Cir.1987). It has no office when the contract clearly resolves the parties' dispute, which is the case here. The agreement that Hosier and Sufrin made on January 10, 1984, governing the division of partnership income, demonstrates without need or occasion to look further that Sufrin was not entitled to share in the contingent fees that Hosier billed to clients that he brought into the firm, such as Telesonics and Lemelson.

The agreement has three key terms, "billings," "overhead," and "residual profits." It provides that Sufrin shall be entitled to keep 75 percent of his billings, minus overhead, plus 33 percent of the residual profits. Examples are given based on alternative assumptions about the number of hours that Sufrin bills in a given year. As for Hosier, he is entitled to keep his billings minus overhead plus 25 percent of Sufrin's billings (after deduction of overhead) plus 67 percent of the residual profits. The contract thus envisages that each lawyer will bill his clients separately, with Hosier getting a cut of Sufrin's billings but Sufrin not getting a cut of Hosier's billings. When Hosier billed on an hourly basis, therefore, he got to keep his entire billings (less overhead); and we cannot see what difference it could make if he billed on some other basis, a contingent-fee basis for example. The contract does not define billings as hourly billings; and it is conceded that when the contract was made, Hosier was hoping to be able to bill on a contingent-fee basis.

On Sufrin's interpretation, Hosier wasn't entitled to keep any of his contingent-fee billings, as such; after deduction of overhead they passed directly into residual profits and Sufrin got a third. Suppose that Sufrin billed, after deduction of overhead, $100,000 a year. Suppose that Hosier billed (after deduction of overhead) $240,000 a year, all in contingent fees. Then on Sufrin's interpretation, Hosier's income for the year would be $185,000 (two-thirds of $240,000 + 25 percent of $100,000) and Sufrin's would be $155,000 ($100,000 − $25,000 + one-third of $240,000), almost as great—and not bad for someone who was to be a one-third partner *after* paying a 25 percent "income tax" to his partner. This is such an implausible result that Sufrin, flinching, says that Hosier would be entitled to keep so much of the contingent fee as represented time put in by Hosier on the case times his hourly rate. But that would not be "billing"; the billing is the contingent fee.

It is true that on this interpretation, Hosier's contingent-fee billing generated no residual profits. But that does not make the contract's provision with respect to such profits illusory. To the extent that either Hosier or Sufrin billed the time of associates at a rate in excess of overhead costs (including associates' salaries), these billings would generate residual profits that would be divided according to the contract. Even if Hosier did no hourly billing, it was expected that Sufrin and any associates working with him would, generating residual profits that the partners would divide.

■ When a written contract contains no textual clue in support of an interpretation wholly implausible in light of uncontested facts, the interpretation should be rejected as a matter of law. *In re Kazmierczak,* 24 F.3d 1020 (7th Cir.1994); *Floralife, Inc. v. Floraline Int'l, Inc.,* 807 F.2d 518 (7th Cir.1986); *Wessels, Arnold & Henderson v. National Medical Waste, Inc.,* 65 F.3d 1427, 1436 (8th Cir.1995); *FDIC v. Prince George Corp.,* 58 F.3d 1041, 1046 (4th Cir.1995). With no contractual right to any of Hosier's contingent fees, Sufrin has no complaint about Hosier's failure to share the Lemelson fees with him even though the fees belonged to

the firm. The fees belonged to the firm, all right, *Saltzberg v. Fishman*, 123 Ill.App.3d 447, 78 Ill.Dec. 782, 785–86, 462 N.E.2d 901, 904–05 (1984), but the partnership agreement gave them to Hosier.

AFFIRMED.